**HARDING v. POLICYHOLDER'S NAT. LIFE INS. CO.**

Civ. No. 244.

District Court, D. North Dakota, Southwestern Division.

May 17, 1944.

C. L. Dawson, of Washington, D. C., for plaintiff.

George J. Danforth, Jr., of Sioux Falls, S. D., and Milton K. Higgins, of Mandan, N. D., for defendant.

VOGEL, District Judge.

This is a suit based upon a contract of life insurance. The case was tried to the Court without a jury. The insurance contract issued by the defendant covered the life of Ray W. Harding and was executed by the defendant at its Sioux Falls, South Dakota, office on November 25, 1927, and mailed by the defendant from Sioux Falls, South Dakota, to the insured, Ray W. Harding, at his address at Hettinger, North Dakota, on November 28, 1927. The policy contract contained the following provision:

"Incontestability.—This policy shall be incontestable after it shall have been in force during the lifetime of the Insured, for one year from its date, provided premiums have been duly paid, except as to provisions and conditions (if any) relating to benefits in event of total and permanent disability and those granting additional insurance against death by accident. Self-destruction within one year from the date hereof, whether the Insured be sane or insane, is not a risk assumed by the Company; but in such event the Company will return the premiums actually paid hereon.

"If the age of the Insured has been misstated, the amount payable under this policy shall be the amount which the premium actually paid would have purchased at the correct age."

Originally Iva Harding, mother of the insured, was designated as beneficiary, but on January 23, 1931, upon application by the insured, the defendant changed the named beneficiary from Iva Harding to Eulalie Church Harding, plaintiff herein, wife of the insured.

Payment of premiums on the policy maintained it in force and effect until November 29, 1934, subsequent to which no premium payments were made by the insured. Under the tables of guaranteed values, however, the policy was continued in force and effect for a period of four years and one hundred fifty-seven days subsequent to January 29, 1934, so that it is undisputed that the policy was in force and effect on December 16, 1937, the date of the occurrence of the events with which we are herein concerned, and for some short time thereafter.

Plaintiff's complaint, after setting forth the facts with reference to the issuance and existence of the policy contract, alleges that on December 16, 1937, while the policy was in full force and effect, Ray W. Harding, the insured, died; that thereafter the plaintiff herein furnished the defendant with due and sufficient proof of death, demanded payment of the principal sum under the policy, and that the defendant failed, refused and neglected to pay the amount thereof.

Defendant's original answer was filed on or about November 25, 1942. Subsequent thereto the parties to the record caused various depositions to be taken in Florida and in North Dakota. In February of 1944, shortly prior to the time for the opening of the term whereat this case was to be tried, defendant moved for leave to amend its answer in order to plead fraud in the inception of the contract. Plaintiff resisted the motion to amend on the ground that it was not timely, and by agreement between counsel ruling on the motion was reserved, so that it is now before the Court for determination. It is claimed by the defendant, and the evidence discloses, that the insured had incorrectly answered certain questions in his application for insurance regarding his past physical history. The record shows that the insured, Ray W. Harding, had contracted tuberculosis immediately following the first World War; that as the result thereof he had been confined in various veterans' hospitals in California and in Minneapolis; that he was hospitalized for approximately a year and a half; that he subsequently recovered from the tubercular condition, although for at least a time following his recovery he had periodical check-ups to ascertain whether or not there had been a return of the disease. In applying for insurance with the defendant he failed to disclose these facts. There can be no question but what his application for insurance contained false statements. Whether they were written in by the local agent of the company, who took his insurance application, in response to the proper inquiries, or made by the agent and signed by him without his having read the application, is not disclosed, nor do I deem it particularly important to the determination of the problems presented. It is claimed by the defendant that the facts disclose that the insured practiced actual fraud upon the defendant in making false statements in his application, which were relied upon by the defendant, and that the contract of insurance was issued thereon.

First, with reference to defendant's motion for leave to amend its answer: It is apparent from the record that the defendant was first apprised of the facts regarding the falsity of the insured's statements on or about April 16, 1943, when the plaintiff's testimony was taken at Tampa, Florida. More complete information was obtained by the defendant at the time of the taking of the deposition of the insured's mother at Dickinson, North Dakota, on November 29, 1943. It is claimed by the attorneys for the defendant that they did not receive a transcript of the testimony of the insured's mother until approximately February 1, 1944 (they attended the taking of the deposition and, of course, were apprised then of all evidence disclosed); that they were of the opinion that the term at which this case would be tried was not to commence until in March, 1944, and that shortly after receiving the transcript of the testimony of the insured's mother they were informed that the term had been advanced by the Court to February 15th, and that immediately upon receiving such information they prepared and served their motion for leave to file an amended answer setting forth the allegations of fraud heretofore referred to.

I am not satisfied that the defendant has exercised that degree of diligence which ought under ordinary circumstances to be exercised by parties desiring to amend their pleadings, but nevertheless, I can see no particular harm to the plaintiff in granting the motion for leave to file the amended answer.

The facts with reference to the insured's physical condition are not at all a surprise to the plaintiff. She knew about them and readily testified to them in her deposition and, subsequently, when she appeared at the time of trial. Courts should be concerned less with technicalities and more with the right or wrong of a situation, and where no injustice or harm can be done by allowing the filing of a belated pleading, and its filing will assist in getting to the bottom of the real issues, it seems to me such motion should be granted. Accordingly, an order will be issued, allowing the filing of the amended answer.

■ The next question for consideration is whether the defense of fraud raised by the defendant's amended answer is a proper one herein and a bar to recovery. Counsel on both sides have presented able briefs in support of their respective positions. Defendant claims, and its counsel argue, first, that this is a contract executed in the State of South Dakota and is governed by the laws of that state. There is no question in my mind of the correctness of that assertion. The policy of insurance was executed by the defendant at its Sioux Falls, South Dakota, office and from that office mailed to the insured in North Dakota. Subsequent to the execution of the policy and its having been placed in the mails, addressed to the insured, nothing was left to be done to complete the contractual relationship between the insured and the insurer. From that time on the policy contract was in force and effect. Accordingly, I am of the opinion that the policy with which we are here dealing is a South Dakota contract and that the laws of the State of South Dakota are applicable.

■ One of the statutory provisions of the South Dakota law, of which this Court takes judicial notice, and which was in force and effect at the time the policy of insurance was executed, is as follows: "31.1508. *Policy; incontestable; when. Unless otherwise specially provided,* no life insurance company doing business in this state shall contest a claim under any policy of insurance *on the plea of fraud or irregularities* in the application after three annual premium payments have been made on the policy, except as to understatements of age, *unless it shall relate to some fact material to the risk and shall have been intentionally made.* Such companies must commence payment of the amount provided by the policy within sixty days after proof of death has been received at the home office of the company." (Section 9313, Rev.Code 1919). (Emphasis supplied.)

Under the above statute if it could be shown that fraud had been practiced upon an insurance company in the execution of a policy, or there had been irregularities in the application therefor, and that such fraud or irregularities related to some fact material to the risk, and were intentionally made, then the insurance company could avoid obligation under the policy and it could be cancelled, even after three annual premium payments had been made. It will be noted, however, that the statute itself carries a provision allowing insurance companies to provide otherwise in their policy contracts or to make their policies more liberal than the quoted statutory provision. It becomes necessary, then, to refer to the particular provisions of the policy issued by the defendant to Harding. The clause referring to incontestability has been quoted in full above. It will be noted that the contract specifically provided "This policy shall be incontestable after it shall have been in force during the lifetime of the Insured, for one year from its date, provided premiums have been duly paid * * *." Defendant argues, however, that where an insurance policy is secured by conscious, intentional and actual fraud the insurance company may defend on the ground of fraud because the contract is void from its inception; that there never existed a valid consent on the part of the insurance company, and that the policy contract, being void from its inception, the incontestable clause quoted above falls with the policy that is void. If that view is to be accepted as sound, then we must find practically meaningless the incontestability clause written into the contract by the defendant itself, and must hold also as meaningless the first part of the incontestability statute of South Dakota, quoted above, wherein the statute says "unless otherwise specially provided".

Defendant relies in part upon the South Dakota case of Life Benefit, Inc., v. Elfring, 7 N.W.2d 133. The distinction between that case and the one with which we are here involved is that the policy in the Elfring case necessarily contained, under the law of South Dakota, a provision that it should be "incontestable *except for fraud,* or nonpayment of dues or assessments, after it shall have been in force during the lifetime of the insured for two years from its date * * *." In reversing the trial court and holding for the insurance company the South Dakota Supreme Court said, 7 N.W.2d on page 134: "The policy was dated on April 20, 1938 and the insured died more than two years thereafter on May 3, 1941. The provision is valid, 29 Am.Jur. § 881, and after the prescribed period has elapsed the validity of a legal policy cannot be disputed *on any other than the excepted ground of fraud.* 1 Appleman Insurance

Law and Practice, § 331. A fraudulent warranty falls within the exception, and the right to contest the validity of the policy for such fraud continues after the statutory period has elapsed. See Combs v. Burbank Mut. Life & Benefit Ass'n, 140 Cal.App. 139, 35 P.2d 132." (Emphasis supplied.)

In the Elfring case the incontestability clause under the statute specifically excepted the defense of fraud and, accordingly, the court could do no other than to allow a showing that fraud had been used in obtaining the contract. In the instant case the statute of South Dakota also excepts under-statements as to age and facts material to the risk intentionally made "unless otherwise specially provided". In the policy here under consideration it is specifically provided that the policy shall be incontestable after one year, provided premiums have been paid. The incontestability clause was written by the defendant itself. It was more liberal with its insureds in respect to the raising of the defense of fraud than the statutes of South Dakota made necessary. Undoubtedly the liberality of the incontestability clause in this particular type of contract executed by the defendant has been used by the defendant as a talking point or an advertising argument in selling its policy contracts to the public, and the Court knows of no reason why it should not be bound thereby. If we are to give life and meaning to the incontestability clause it must be held to mean exactly what it says, that is, that after a period of one year the contract cannot be contested by the defendant except for non-payment of premium. Accordingly, it is the holding of this Court that the defense of fraud pleaded in the defendant's amended answer is not now available to the defendant.

We now come to the third and last question concerning the rights of the parties. Plaintiff alleges that the insured died on December 16, 1937, at Salt Springs, near Sarasota, Florida. The facts as they appear from the evidence are as follows: Some short time prior to December 16, 1937, the insured, Ray W. Harding, his wife, the plaintiff in this action, and the insured's mother, Iva Harding, left North Dakota in the insured's car for a winter trip to Mexico and Florida. The insured was the owner and operator of North Dakota farm lands.

Prior to leaving North Dakota he discussed and made various plans for work and improvements on his farm properties. The party drove to Mexico, staying there but a short time, and eventually arrived at Englewood, Florida, the home of the plaintiff's father. The insured and the plaintiff had previously visited in Englewood during the winter of 1935–36. On their trip they planned on staying some little time. On December 16th, while the plaintiff and some other members of the family had gone to a nearby town to do Christmas shopping, the insured, accompanied by his mother, his father-in-law and a small niece, went to Salt Springs to swim and dive. The insured had been at Salt Springs on one other occasion during a prior visit to Florida. The insured liked to swim and was an expert diver. He was last seen in the Spring in about 80 feet of water after having made two or three dives from the diving board. He was dressed only in trunks. A number of other persons, strangers to the parties to the record, were also swimming in the pool. Insured's father-in-law stayed near the automobile. Insured's mother was attending to the niece. The insured was the only one of their immediate party swimming. Insured's mother, because her attention was necessarily taken up with the child, did not observe the insured all of the time during his diving and swimming activities. When she noticed his absence an alarm was given and a search was made. The insured was not located. Subsequently expert divers were employed and the Salt Springs pool was examined and searched as thoroughly as it was possible under the conditions existing. The insured's body was never located. Salt Springs pool is located some little distance off the main highway and is surrounded on three sides by dense undergrowth, including saw-toothed palmetto, which was infested with rattlesnakes and other reptiles. Crocodiles of various sizes have been seen in or near the pool within recent periods. The pool itself is of unknown depth. Although some measurements indicated 210 feet, there is testimony to the effect that soundings indicated a depth of 2900 feet. There is also testimony that within the pool at various depths from the surface thereof, there were caves or caverns. It is the theory of the plaintiff that the insured dove into the pool and that in some manner

his body got into one of the caverns mentioned and, because thereof, could not be recovered. It is the defendant's theory that the insured could not possibly have drowned in the pool without his body having been discovered, and that he did not drown in the pool, but that he either had an attack of amnesia and wandered away, and that he is still suffering from amnesia, or that he voluntarily disappeared. The latter theory is premised upon evidence indicating that the insured was a somewhat moody individual who did not like the company of other persons, who quarreled with his wife, who in recent years had been subject to certain epileptic fits which caused him to be morose and unhappy. Other testimony indicates that the insured was in fairly good physical condition, completely recovered from the tuberculosis from which he suffered in the early '20's, and that he appeared to he recovering from the condition causing epileptic fits, and that the arguments or disagreements with his wife were merely those of ordinary occurrence and that, in truth and in fact, he and his wife were happy in their married life and completely devoted to each other. An examination of the testimony regarding the husband and wife disputes convinces the Court that they were nothing more or less than the ordinary disagreements or irritabilities which so frequently arise between humans bound in matrimony, and that they do not indicate any basic or underlying disagreement or unhappiness in each other's association. The testimony indicates that such disputes were concerned with money matters, the insured's wife having some money of her own and she being more or less the financial manager of their family entity. There was also some testimony regarding disputes between husband and wife concerning the wife's relations with the insured's mother. Nothing in the testimony, however, justifies the conclusion that such disputes were much, if any,

more than the average husband and wife will engage in although completely devoted to each other. I, accordingly, can find no justification for the theory that the insured was so unhappy in his married life, or so worried or morose regarding his physical condition that it was his desire to break away from his family relationship and disappear into a new and strange entity, with a new name and the added problems of trying to eke out an existence of happiness alone and without the assistance of members of his family and his friends and acquaintances. In addition thereto, it seems to me most improbable that the insured could have voluntarily or involuntarily disappeared under the circumstances as they existed at the time. It would have been necessary for him alone and unclothed except for a pair of trunks, to have worked his way through a dense thicket of saw-toothed palmetto, infested with snakes and crocodiles, to have then obtained the assistance of other persons in getting transportation elsewhere, in finding clothing, and in keeping hidden from the authorities in a case given wide publicity and receiving considerable public attention. There is no indication that the insured had any funds with him at the time; in fact, the evidence indicates the contrary, it having been necessary for him to borrow the price of admission to the Salt Springs pool from his father-in-law, he having forgotten to take any money with him. All of the facts and circumstances point to the conclusion that the insured met his death by drowning, and that his body has never been recovered due to the physical structure of the pool wherein he was swimming or diving. To my mind no facts of substance lead to a contrary conclusion. I, accordingly, find that the deceased met his death by drowning on December 16, 1937, and judgment will be ordered for the plaintiff in accordance herewith.