POLICYHOLDER'S NAT. LIFE INS. CO.
v. HARDING.

No. 12975.

Circuit Court of Appeals, Eighth Circuit.

March 8, 1945.

852

G. J. Danforth, Jr., of Sioux Falls, S. D. (George J. Danforth, of Sioux Falls, S.D., and M. K. Higgins, of Mandan, N. D., on the brief), for appellant.

C. L. Dawson, of Washington, D. C. (John Keohane, of Beach, N. D., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

This is an appeal in a suit upon a life insurance policy. The case was tried to the court without a jury, and judgment was entered for the plaintiff beneficiary. The court made findings of fact and conclusions of law and filed an opinion. Harding v. Policyholder's Nat. Life Ins. Co., 56 F.Supp. 854. Two questions are presented on the appeal of the defendant company. They are:

1. Does the evidence support the finding that the insured died on December 16, 1937?

2. Does the incontestability provision of the policy bar the defense of fraud based upon false answers to interrogatories in the application?

[1] The defendant contends that the finding that the insured died December 16, 1937, is clearly erroneous within the meaning of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. In applying Rule 52(a) to findings assailed as erroneous Courts of Appeals are guided by the established principle that a finding of fact made by a district court is not clearly erroneous unless it (1) is unsupported by substantial evidence, (2) is contrary to the clear weight of the evidence, or (3) is induced by an erroneous view of the law. Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F. 2d 197, 199; Sears, Roebuck & Co. v. Talge, 8 Cir., 140 F.2d 395, 396.

A careful consideration of the whole record discloses that there is no significant conflict in the testimony relating to the controlling evidentiary facts. The dispute concerns the proper inferences to be drawn from the facts in evidence.

The policy was issued in South Dakota on the life of Ray W. Harding on November 25, 1927. The plaintiff claimed and the court found that the insured died by drowning in Salt Springs, near Englewood in Sarasota County, Florida, on December 16, 1937. It is conceded that the policy, if valid, was in force at that time. The defendant's contention is that the proof fails to establish the drowning; that it is a case of a disappearance only; that the insured wandered away as a result of amnesia or because of an alleged unhappy family relation.

Salt Springs is described in the evidence as a pool or spring located about two miles from the main highway, known as Tamiami Trail. As the name indicates, the water is salt with supposedly medicinal qualities. The pool is circular in form and from 200 to 300 feet in diameter. It is at least 210 feet deep and is fed by underground springs. The adjacent country is comparatively level. On three sides the pool is surrounded by vegetation consisting largely of sawtooth palmettos. The brush and undergrowth are infested with rattlesnakes and other poisonous reptiles, and alligators have been found in and around the pool. On the open side of the pool is a sandy shore used as a bathing beach, where a diving board extending out over the water is located. The water below the diving board is 82 feet deep. There are some small toilets and a dressing cabin on the open side of the pool. The unpaved road leads from the main highway to this open space. Some distance

below the surface of the water are rocky caverns, one of which was about 10 feet below and a little to the right of the outer end of the diving board. No one has been known to enter this cavern, but it has been explored since December 16, 1937, by means of projecting apparatus for a distance of approximately 45 feet without being able to determine its dimensions. There is a conflict in the evidence as to whether the pressure of the water is upward or downward in front of the cavern. An expert diver employed to search for the body testified that the pressure of the water is downward around the edge of the pool above the caverns. Tests were made by sinking light objects to a depth of 200 feet or more and releasing them. Some rose to the surface almost directly above the point where they were released while others did not return to the surface at all. While a surface outlet from the pool discharged approximately 17,000 gallons of water about every three minutes, some of the investigators believed that there is another underground outlet through one or more of the caverns.

In December, 1937, the insured and his wife (the plaintiff) and his mother were stopping at the home of his father-in-law about 14 miles distant from Salt Springs. On the morning of the 16th the plaintiff and other members of the family went to Sarasota to do Christmas shopping. Meantime, about one o'clock in the afternoon, the insured, his mother, his father-in-law, and a little child drove to Salt Springs. They stopped at the post office on the way to inquire about the road. The insured had been there only once before, in 1935, but was not familiar with the country or the spring. The insured was in good spirits and visited with an acquaintance at the post office. When they arrived at the pool several strangers were in swimming. The insured, a strong man who enjoyed swimming and diving, was the only member of his party who cared to swim. He went directly into the dressing cabin where he undressed and put on trunks. After he went into the pool his mother saw him dive from the diving board and swim about. Meanwhile she was looking after the child that had accompanied them. After he had been in the water not more than half an hour she missed him and gave the alarm. A search was made but he could not be found al-

though the pool was dragged and dynamited. His clothes were where he had left them in the dressing room. No one saw him leave the pool, no tracks leading from the pool could be found. Great publicity was given to his disappearance, but no trace of him had been discovered at the time of the trial in February, 1944. The sheriff of the county and the constable joined in the search, but without avail.

It was the theory of the plaintiff and some of the searchers that the body was in one of the caverns below the surface of the water. The theory of the defendant that he may have wandered away has little to support it. That he was moody at times is shown, but that he was not so on this day is undisputed. The evidence of his quarrelling with his wife referred to comparatively trivial matters which were of little consequence. That their relations were cordial and affectionate are evidenced by the fact that when she started to town that morning she kissed him good-bye.

In considering the probability whether the insured could have, voluntarily or involuntarily, disappeared under the circumstances as they existed at the time, the court in its opinion said: "It would have been necessary for him, alone and unclothed except for a pair of trunks, to have worked his way through a dense thicket of saw-toothed palmetto, infested with snakes and crocodiles, to have then obtained the assistance of other persons in getting transportation elsewhere, in finding clothing, and in keeping hidden from the authorities in a case given wide publicity and receiving considerable public attention * * *. All of the facts and circumstances point to the conclusion that the insured met his death by drowning, and that his body has never been recovered due to the physical structure of the pool wherein he was swimming and diving."

■ In view of all these considerations mentioned by the court and in view of the insured's ignorance of the dangers incident to the cavern below the diving board, in view of the fact that there were at the time 15 or 16 other persons in and about the comparatively small pool and that none of them saw him depart, and in view of the fact that a diligent search was made almost immediately after his presence was missed and no tracks leading from the pool were found in the adjacent white

sand, this court can not say that the finding of the court is not supported by substantial evidence.

The record shows that the insured made false answers to certain questions in his application and to the medical examiner regarding his history. Contrary to his negative answers to specific questions, he had after his return from World War One suffered from tuberculosis for a period of about five years; he had spent time in hospitals and sanitariums under the care of physicians; and he had also been afflicted with epilepsy. The evidence showed that these facts were material to the risk, and that the policy would not have been issued had they been disclosed.

The policy contained an incontestability provision reading as follows:

"Incontestability.—This policy shall be incontestable after it shall have been in force during the lifetime of the Insured, for one year from its date, provided premiums have been duly paid, * * *."

The policy also contained another provision relied upon by the defendant reading as follows:

"Policy Contract.—This policy and the application therefor, taken together, constitute the entire Contract between the parties. * * * All Statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties, * * *."

The court held that the policy is a South Dakota contract, and that holding is not contested here.

The statutes of South Dakota (Code of 1939) provide:

"31.1508 Policy; incontestable; when. Unless otherwise specially provided, no life insurance company doing business in this state shall contest a claim under any policy of insurance on the plea of fraud or irregularities in the application after three annual premium payments have been made on the policy, except as to understatements of age, unless it shall relate to some fact material to the risk and shall have been intentionally made. Such companies must commence payment of the amount provided by the policy within sixty days after proof of death has been received at the home office of the company." Section 9313, Rev. Code 1919.

Other provisions of the statute define fraud and provide that upon the discovery of fraud in the procurement of a contract an aggrieved party may rescind it. Such provisions are not helpful here. This is a life insurance policy on which more than three annual premium payments had been made, and it is not claimed that an understatement of age was made. The applicable language of § 31.1508, therefore, is that "Unless otherwise specially provided, no life insurance company doing business in this state shall contest a claim under any policy of insurance on the plea of fraud or irregularities in the application * * *, unless it shall relate to some fact material to the risk and shall have been intentionally made." (Italics supplied). The trial court construed this statute to mean that if it could be shown that such fraud had been practiced upon an insurance company the insurance company could avoid the obligation and cancel the policy, even after three annual premium payments had been made, "Unless otherwise specially provided" in the policy. The court held further that the incontestable clause in the policy does provide otherwise; that the policy is more liberal than the statute. By its terms the policy is made absolutely incontestable after one year, except as to matters not here material. The statute by the words "Unless otherwise specially provided" leaves a life insurance company free to include in its policies such provisions as to incontestability as it may choose. The company is free to make more liberal provisions than those contained in the statute. Here the company did not except fraud and limited its right to contest the policy to one year instead of three as provided in the statute.

The defendant argues that the fraud in this instance inhered in the inception of the contract and that the policy, including the incontestability clause, was void ab initio, and not merely voidable. Neither the statute nor the policy supports this view. The fraud here consisted of false answers in the application, and this type of fraud is expressly covered by the statute, while the incontestable clause in the policy does not except any form of fraud.

The "Policy Contract" clause, supra, provides that "All statements made by the Insured shall, in the absence of fraud, be deemed representations and not warranties, * * *." (Italics supplied.) The defendant argues that this clause reserves to it the right to contest the policy at any time for fraud in the application. The authorities are to the contrary. See

New York Life Ins. Co. v. Kaufman, 9 Cir., 78 F.2d 398, 403. The most that can be said for this clause, if it should be read and construed with the incontestable clause, is that it creates an ambiguity, and it is settled that ambiguities in a life insurance policy must be resolved in favor of the insured. Mutual Life Ins. Co. v. Hurni Packing Co., 263 U.S. 167, 44 S.Ct. 90, 68 L.Ed. 235, 31 A.L.R. 102, and cases cited; Ness v. Mutual Life Ins. Co., 4 Cir., 70 F.2d 59. This is true because, as said in the Hurni case, supra [263 U.S. 167, 44 S.Ct. 91], "The language employed is that of the company and it is consistent with both reason and justice that any fair doubt as to the meaning of its own words should be resolved against it." Further, the incontestable clause is to be construed liberally, and as covering false representations and fraud on the part of the insured. Mutual Life Ins. Co. v. Hurni Packing Co., supra; Great Southern Life Ins. Co. v. Russ, 8 Cir., 14 F.2d 27, 28; Dakota Life Ins. Co. v. Midland Nat. Bank, 8 Cir., 18 F.2d 903, 905; Columbian Nat. Life Ins. Co. v. Wallerstein, 7 Cir., 91 F.2d 351; Plotner v. Northwestern Nat. Life Ins. Co., 48 N.D. 295, 183 N.W. 1000. No South Dakota case holding to the contrary has been called to our attention, and we are unable to find one. The case of Life Benefit, Inc., v. Elfring, S. D., 7 N.W.2d 133, 134, cited by the defendant, is not in point. In that case the company was a mutual assessment life insurance corporation and the statute Laws S.D.1935, c. 133, § 4 provided that "Every such corporation or association shall provide by its by-laws that every life policy or certificate issued by it shall be incontestable *except for fraud* * * * after it shall have been in force during the life time of the insured for two years from its date * * *"; (italics supplied); and the opinion of the court recites that "The by-laws of the company and the policy delivered were drafted in compliance with the quoted provision of statute." For that reason the case is distinguishable from the present case.

██ Finally, the defendant complains that the court admitted evidence either without ruling on its objections or by taking the answers subject to the objections. No further request was made for a ruling in any instance in the course of the trial. Under these circumstances the defendant is not entitled to a review of the objections by this court. Moreover, the action having been tried to the court without a jury the presumption prevails that the court considered only the competent evidence. Garden City Feeder Co. v. Commissioner of Internal Revenue, 8 Cir., 75 F.2d 804, 807; Clauson v. United States, 8 Cir., 60 F.2d 694, 696; Southern Pac. Co. v. Kalbaugh, 9 Cir., 18 F.2d 837.

The judgment appealed from is affirmed.

██ The appellee has filed two motions in this court in connection with the appeal. The first motion calls for an order to tax the costs of printing Appellee's Supplement to the Record, which was filed under Rule 10(c) of this court; and the second motion asks for an award of damages under our Rule 21(b) on the ground that it is apparent that the appeal was taken merely for delay. Both motions have been duly considered, and it is ordered that one-half the cost of printing the Supplement to the Record be taxed to appellant and that the motion for an award of damages be denied.