**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Carl J. MADDA, Defendant-Appellant.
No. 14703.**

United States Court of Appeals
Seventh Circuit.

April 29, 1965.

George D. Crowley, Willliam A. Barnett, Chicago, Ill., Crowley, Barnett &

Goschi, Chicago, Ill., of counsel, for appellant.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, John Powers Crowley, Arthur L. Dunne, Chicago, Ill., for appellee.

Before DUFFY and CASTLE, Circuit Judges, and MAJOR, Senior Circuit Judge.

DUFFY, Circuit Judge.

The indictment herein charged that defendant Madda gave the sum of $200 to Erwin I. Katz, an assistant United States attorney, with intent to influence Katz' decision and action with respect to a case entitled Janus v. United States, in violation of 18 U.S.C. § 201(b). The Janus case involved a claim under the Federal Tort Claims Act, and was pending before Judge Hoffman in the United States District Court for the Northern District of Illinois, Eastern Division.

In the instant case, the jury found the defendant guilty of the charge and this appeal is from the judgment of conviction.

Before the trial in the District Court, defendant filed motions for discovery and inspection and to suppress evidence; also to transfer the cause to the Executive Committee of the District Court for reassignment. These motions were denied.

Three days before the trial, and about two and a half months after the motion to transfer the case had been denied, a subpoena was served on Judge Hoffman at the instance of the defendant, requesting the judge's appearance as a witness at the trial. Judge Hoffman was tendered an unsigned check for $4.16 purporting to be witness fees. A motion to quash the subpoena was granted. Defendant then appeared before this Court and petitioned for a writ of mandamus to compel Judge Hoffman to respond to the subpoena. The petition was denied by us. No effort was made to call Judge Hoffman as a witness during the course of the trial.

Defendant claims that it was Katz who first made the suggestion as to the bribe, and one of his defenses in the trial below was that of entrapment. It therefore becomes necessary to review in some detail, the testimony of Katz as to what was said by him and by the defendant leading up to the passing of the bribe money from defendant to Katz.

Katz testified defendant, Madda, a Chicago Transit attorney, told him he was handling the Janus case on the side, and asked Katz not to call him at the Chicago Transit Authority office but rather at the law offices of Attorney Fred Krol with whom he was working. Katz informed Madda he had authority to settle cases up to $3000 without prior approval of the Department of Justice.

On December 17, 1963, Katz saw defendant in Judge Hoffman's courtroom, and had a conversation with him in the corridor near the courtroom. Katz told defendant he would raise his settlement offer from $300 to $500 on the basis of a nuisance value. Defendant declined. On the afternoon of the same day, Katz telephoned defendant to tell him of a change in the trial date of the Janus case from December 18 to December 19. Defendant then asked for a meeting to further discuss a possible settlement. Katz replied that he was leaving his office at 3 p. m. to get a prescription filled at a drug store, and that he would stop by defendant's office. Defendant suggested that he come to Mr. Krol's office which Katz did, and there, for the first time, met Attorney Krol.

Katz refused to increase his offer of $500. Defendant said "We've got to settle this case. We don't want to try this case." Katz testified that as Krol was answering a telephone call, defendant Madda said to him "We've got to settle this case, Erv. We don't want to try this one. If you give us two thousand, we'll give you two hundred." Katz testified he made no direct answer, but in further conversations, refused to settle the case for more than $500, and that when Krol answered a second phone call, defendant stated to him "If you give us two thou-

sand, we'll give you two hundred." Katz replied "I'll call you tomorrow."

Katz proceeded directly to the office of the United States attorney and contacted the Chief of the Criminal Division. After conferring with him, the latter placed a call to the office of the Federal Bureau of Investigation (FBI). Shortly thereafter, Special Agent Bloom of the FBI called Katz.

The following day, Bloom searched Katz, made an inventory of the contents of his pockets and, with Katz' consent, attached a tape recorder to his person. He instructed Katz in its use. Katz proceeded to the Jockey Club bar in the Morrison Hotel where he met defendant Madda. Katz testified he and defendant seated themselves side by side at the bar and engaged in conversation. Special agents of the FBI were in the room and observed them. Defendant ordered a drink for Katz and asked him "Are we going to trial or not or what?" Katz responded "You made an offer yesterday. Were you serious?" Madda took a cocktail napkin and wrote on it "O.K. on the deal." Defendant slid the napkin to Katz who said "O.K." and wrote on the napkin "Mine before." Defendant took the napkin and tore it into small pieces and placed the pieces in an ashtray on the bar. These pieces were later retrieved by Katz. The napkin was reconstructed in part and the words hereinbefore quoted are clearly legible. The napkin, after identification, was marked Government Exhibit 3, and was received in evidence.

Katz testified to a further conversation at the bar. The defendant asked Katz "Is it O.Kay if you wait until tomorrow?" Katz said to Madda "You made an offer yesterday. Were you serious?" Defendant replied "Erv, you scare me. I think you got a tape recorder on you or something." Katz said he lifted his arm and said "Sure, it is right up my sleeve" and defendant replied "No, seriously Erv, it scares me a little, but I have nothing to prove it."

Katz testified discussion was had with respect to details in settling the Janus case and having it dismissed in court.

Then defendant wrote on another piece of the cocktail napkin "If you say you'll settle this case for $2000, I'll make the call and get $200." Katz then asked "How do I know you are not setting me up for something here?" The defendant denied the suggestion. Then Madda said "We'll settle this for $2000, okay?" and Katz replied "Fine, we'll settle it for $2000," and asked defendant if he wanted to make the call now to which defendant replied "Yes." The defendant then took the second piece of the cocktail napkin and placed it in his left-hand pocket. Defendant left the bar to make the phone call and returned saying "All set, okay if we do it tomorrow?"

Katz testified that most of the conversation with defendant was in a low voice and at times portions of their conversations were in a whisper. Katz then returned to the United States attorney's office where the tape recorder was removed from his person and the bits of napkin which had been retrieved from the ashtray were turned over to the FBI.

On December 19, 1963, a tape recorder was again placed on Katz' person. A conversation between Katz and defendant took place in Judge Hoffman's courtroom next to the door leading to the corridor. Katz testified defendant said "Come on to the office and we will take care of it all right now." Katz demurred, and then Katz and defendant agreed to meet in about fifteen minutes at a coffee shop across the street from the courthouse. Katz was again searched by FBI agents and then proceeded to the coffee shop. Several FBI agents were in the coffee shop. Katz activated the tape recorder.

Katz testified that after defendant ordered coffee, the latter reached into his pocket with his left hand and put his two hands together under the table and then reached across with his right hand and placed several bills in Katz' hand. Katz placed the bills in his left-hand pocket and asked defendant if he had counted it. Defendant replied "It's all there, the full $200." In response to another question, defendant said "It's all there, four times fifty."

Katz then gave a pre-arranged signal and the defendant was taken into custody. The FBI agents searched Katz and four $50 bills which were later introduced in evidence, were taken from Katz by the agents, and the tape recorder was removed from his person.

Prior to the testimony by Katz, four of his statements were turned over to defendant's attorney, Crowley, by assistant United States attorney Bittman. The following day, defendant's attorney moved for the production of the tapes of the conversations between Katz and defendant, claiming the right to do so under Section 3500(e) (2), Title 18 U.S.C. The trial court denied the motion. Defendant's attorney Crowley then cross-examined Katz who again reiterated the circumstances of the occurrence at the Jockey Club.

Katz testified that the tape taken at the Jockey Club was almost audible, not completely. Also, that the tape was a true and accurate recording of the conversations there held. Several special agents of the FBI testified as to observing the meetings between defendant and Katz. Agent Stahl testified he searched the person of Katz on December 19, and recovered $200 which had been given to Katz by the defendant.

Special Agent Bloom testified as to the meetings between defendant and Katz on December 18 and December 19; that he attached the tape recorder to Katz; that he observed defendant write on a napkin and was present when the bits of the paper napkin were removed from Katz' pocket. Bloom had custody of the recording tape and testified it was in the same condition at the time of the trial as when he had taken it from the recorder.

Objection was made to receiving the tape in evidence. The jury was excused. A voir dire hearing was held pertaining to the admissibility of the tape. When the tape recording was originally played in court, it was inaudible due to "technical defects." That evening, Special Agent Bloom took the "Jockey Club" tape to the RCA sound recording studio in Chicago and was present when John

Janus, a sound engineer of the studio, made copies of the tape. The original tape was designated as Exhibit 10; the first copy as Exhibit 10A and the second copy as Exhibit 10B.

Janus testified the entire conversations contained in the original tape were completely recorded on Exhibit 10B; that the material contained on the original tape was the same material as in 10B; that he did not dub in any sound; that Exhibit 10B was more audible by cutting down background noises in Exhibit 10.

Katz testified that Exhibit 10B truly and accurately reflected the conversations he had with the defendant.

The following morning, in the presence of the jury, the original tape, Exhibit 10, and the copy, Exhibit 10B, were offered and received into evidence. Katz identified the voices as they appeared on the tape when Exhibit 10B was played before the jury.

Both Krol and defendant testified it was Katz who solicited the $200 bribe. Krol obtained the $200 by withdrawal from his bank account. Krol admitted that despite the fact he had three conversations with FBI agents following defendant's arrest, he never mentioned, at any time, that Katz had solicited the bribe.

Defendant's principal claim of error is in the admission into evidence of the sound recording tape, Exhibit 10B. Defendant argues that the procedure used to get the tape in evidence was "shockingly improper." Defendant goes so far as to argue that except for the tape recording 10B, there is no evidence to corroborate the testimony of Katz. We disagree!

We think a proper foundation was laid for the admission of recording tape 10B. The voir dire hearing took place with the consent of defendant's counsel. Testimony hereinbefore recited identified the tape played as truly and accurately reflecting the conversations between Katz and the defendant.

■ We find no error in the fact that a foundation for the admissibility of the tape recording was made at a voir dire hearing. Monroe v. United States, 98 U.S.App.D.C. 28, 234 F.2d 49, cert. den. 352 U.S. 873, 77 S.Ct. 94, 1 L.Ed.2d 76. The Court in that case stated at page 54 of 234 F.2d: "Appellants also argue that particular recordings, because inaudible at times or incomplete, gave the jury only a part of what they purported to represent. * * * No all embracing rule on admissibility should flow from partial inaudibility or incompleteness. * * * Unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy the recording is admissible, and the decision should be left to the sound discretion of the trial judge. This is especially so when the witness who heard the statements recorded also testifies, so that the recordings give independent support to his testimony. * * * "

■ We hold that a proper foundation was laid for the admission into evidence of Exhibits 10 and 10B; that the action of the trial court in admitting same was not an abuse of discretion, and we hold that no error was thereby committed.

■ The defense of entrapment was not proved. The trial court properly instructed the jury as to that defense. We find no error on this point.

Defendant claims error contending that remarks of a government attorney in arguing to the jury were inflammatory and prejudicial. We have examined the record and hold that there was no prejudicial error in the argument of the government's counsel to the jury.

Defendant tenders the oft-presented argument claiming errors in instructions given, and error in failing to instruct the jury as requested by the defendant. An extended discussion on this point is unwarranted. We hold there was no prejudicial error in this respect.

Still other claims of error are made which we have considered but which we hold to be without merit.

The judgment of conviction is

Affirmed.