Marion Francis FOUNTAIN and Roosevelt Tremble, Appellants,

, v.

UNITED STATES of America, Appellee.

Eugene J. MARSHALL, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 23220, 23238.

United States Court of Appeals Fifth Circuit.

Aug. 9, 1967.

Rehearing Denied Jan. 8, 1968.

626

Eugene Tannenbaum, Miami, Fla., for appellants Fountain and Tremble.

Leonard R. Mellon, Miami, Fla., for appellant Marshall.

Aaron A. Foosaner, First Asst. U. S. Atty., Edward A. Kaufman, Asst. U. S. Atty., Miami, Fla., for appellee.

Before WISDOM and GODBOLD, Circuit Judges and McRAE, District Judge.

GODBOLD, Circuit Judge.

Appellants were law enforcement officers assigned to duties in Miami relating to narcotics enforcement.[1] All were charged in a five-count indictment with conspiracy to violate 26 U.S.C.A. §§ 4704(a) and 4705(a) (illegal sale or distribution of narcotic drugs) and 18 U.S.C.A. § 201(b) (bribery of public official). In addition, Marshall was charged with four substantive counts of violating 18 U.S.C.A. § 201(c) (soliciting and accepting bribes) and Fountain and Tremble were charged with aiding and abetting Marshall. Pleas of not guilty were entered, and a jury verdict of guilty on all counts was returned. All three now appeal, urging two primary grounds for reversal. We affirm.

1. Restriction of right to cross examination.

The government's principal witness was Holsten James Newbold, named in the indictment as a co-conspirator but not indicted. Newbold testified to a series of transactions implicating all three appellants in a scheme to provide him with protection in his illicit narcotics operations in return for payments. Appellants urge that their cross examination of Newbold was erroneously restricted.

On cross examination there was testimony that after the arrest of appellants Newbold had traveled to Kentucky, New Jersey, Canada and several other places.

When asked the source of the money that enabled him to travel so extensively, Newbold declined to answer and when questioned by the court indicated that the answer might tend to incriminate him.

On direct examination of Newbold it had been developed that in order to make the initial protection payment he had asked his wife to withdraw money from a bank account. On cross examination Newbold was asked, "How had you come about this money to start with?" He again refused to answer on Fifth Amendment grounds; no specific objection was made, and the court was not asked to rule upon the legitimacy of this refusal to answer.

■■ There is involved here a conflict between the Sixth Amendment right of a criminal defendant to confront witnesses against him, which includes the right to effective cross examination,[2] and the Fifth Amendment right of a witness to decline to give answers which subsequently might be used against him. In resolving this conflict, the courts have made two inquiries: whether the witness may properly invoke the privilege on cross examination, and if so whether, in view of the restriction on cross examination this necessitates, his testimony on direct may nevertheless go to the jury.

■ If on direct a witness testifies to incriminating matters, he is considered to have waived the privilege as to those matters and may not, on cross, decline to answer questions as to details of the matters he has already revealed. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951). See

---

1. Eugene J. Marshall was Agent-in-Charge of Miami office of the Federal Bureau of Narcotics. Marion Francis Fountain was a sergeant, and Roosevelt Tremble an officer, of the Miami Police Department.

2. While it is often stated that the scope of cross examination is within the discretion of the trial judge, we have made clear

that this discretionary authority to limit cross examination comes into play only after there has been permitted as a matter of right sufficient cross examination to satisfy the Sixth Amendment. Grant v. United States, 368 F.2d 658 (5th Cir., 1966); Dixon v. United States, 333 F.2d 348 (5th Cir., 1964).

also Montgomery v. United States, 203 F.2d 887 (5th Cir., 1953). However, if the testimony sought to be elicited on cross is not merely a more detailed inquiry into matters as to which the witness already has waived his right, the witness may invoke the privilege.

██ Where the privilege is legitimately invoked by a witness during cross examination, all or part of that witness's direct testimony may be subject to a motion to strike. The ultimate inquiry is whether the defendant has been deprived of his right to test the truth of the direct testimony. United States v. Cardillo, 316 F.2d 606, 611 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). If he has, so much of the direct testimony as cannot be subjected to sufficient inquiry must be struck. The distinction is generally drawn between invoking the privilege as to "collateral matters," not requiring the striking of direct testimony, and invoking it as to "direct" matters. United States v. Cardillo, supra, 316 F.2d at 613. See also Coil v. United States, 343 F.2d 573 (8th Cir.), cert. denied, 382 U.S. 821, 86 S.Ct. 48, 15 L.Ed.2d 67 (1966); Smith v. United States, 331 F.2d 265 (8th Cir.), cert. denied, 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964); United States v. Collier, 362 F.2d 135 (7th Cir., 1966), cert. denied, 385 U.S. 977, 87 S.Ct. 519, 17 L.Ed.2d 439 (1967). But the line between "direct" and "collateral" is not clear, and the question in each case must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony.

██ Here the first assertion of the privilege involved a matter not covered on direct examination; no inquiry had been made on direct into Newbold's activities after the arrest of appellants. There was, therefore, no waiver of the privilege and it was properly invoked by Newbold. In view of the collateral na-

ture of the inquiry thereby foreclosed, it was not error to permit the direct testimony to go to the jury.

██ The second invocation of the privilege presents a more difficult matter. Here again we feel that the privilege was properly invoked; while the making of the initial payment and the withdrawal from the account were covered on direct examination, this cannot be construed as a waiver of the right to decline to reveal potentially incriminating information as to the source of the money in the account. Appellants now urge, however, that if permitted to pursue the inquiry they would have been able to demonstrate that Newbold did not in fact have the money to make the payments he testified to having made; thus it is urged that the jury was improperly permitted to consider Newbold's direct testimony as to the payments. This objective of the questions propounded on cross was not revealed to the district judge, however, and counsel did not pause long enough in his cross examination to request that the court rule on the witness's refusal to answer. Nor was a motion to strike the direct testimony made. Since the district court was neither apprised of the purpose of the inquiry nor asked to rule on the matter or to strike the direct testimony, the situation cannot require reversal, United States v. Sanchez, 361 F.2d 824 (2nd Cir., 1966), Policyholder's National Life Ins. Co. v. Harding, 147 F.2d 851 (8th Cir., 1945), Traylor v. Pickering, 324 F.2d 655 (5th Cir., 1963), unless it amounts to "plain error" within the meaning of Fed.R.Crim.P. 52(b).

██ We have made clear that "[T]he plain error rule * * * is not to be used where substantial rights are not affected * * * and the appellant has not been deprived of any substantial right." Cook v. United States, 320 F.2d 258, 260 (5th Cir., 1963). In this case inability to inquire into the source of the funds did not deprive appellants

of the right to test the truthfulness of Newbold's direct testimony in any substantial way. Since the source of the money was not placed directly in issue, the inquiry was collateral. The proposed inquiry was one which, if permitted, could only have established the basis for the first of a long series of inferences necessary to reach a conclusion directly related to the issues in the case.[3] In addition, the introduction by the prosecution of the bank's records, showing the existence of the account and a withdrawal of $800 at the time Newbold's testimony indicated the withdrawal occurred, suggests—but does not conclusively establish—that the inquiry would have been of minimal value. Under all of the circumstances, we cannot say that the district court deprived appellants of their constitutional right to test the accuracy of Newbold's direct testimony.

2. Use of recorded telephone conversations.

Appellants' second contention relates to reception into evidence and presentation to the jury of tape recorded telephone conversations between Newbold and appellants. Objection is also raised to permitting the jury, while listening to the tapes, to read what purported to be a written transcript of the conversation recorded on the tapes.

Newbold had reported to the Miami Police Department the alleged illegal transactions between himself and appellants. With Newbold's permission a monitoring device was installed on his telephone. Between April 15 and April 20 (when appellants were arrested), a number of phone calls between Newbold and appellants were monitored and recorded on magnetic tape. A monitoring device also was placed in Newbold's apartment, and a conversation among Newbold and all three appellants was monitored and recorded by three officers stationed in the apartment next door.

All tapes were taken to the United States Army Sound Laboratory at Washington, D. C., where copies of each were made and the originals returned. The copies were then run through a "noise suppressor" designed to remove background noises to make the conversations more audible, especially when the tapes were played at high volume.[4] Subsequently, over a four-day period, Lieutenant Malcolm Gracy of the Miami Police Department Internal Security Unit prepared a written transcript of the recordings. Gracy, who had known each appellant for a number of years (and Fountain for eighteen years), testified that he was easily able to recognize and distinguish among the voices on the tapes and that after playing the recordings repeatedly over the four-day period he was able to understand "most of" the conversations. He testified that the transcript accurately reflected the audible portions of the recorded conversations.

When the tapes (both originals and copies) were offered into evidence an extended hearing was held out of the presence of the jury on their admissibility. The District Judge first listened to and compared the original recording

---

3. The line of logical inferences suggested by appellants is long: if Newbold could not satisfactorily explain the source of the money in the bank account, this permitted (but would not require) the inference that the money was not in the account; this permitted the inference that he did not have the $1,000 required for the initial payment; this in turn permitted the inference that he could not have made the payment, i. e., that his testimony on direct was incorrect.

4. Concerning the function and operation of the noise suppressor, Sergeant Per-

mer, Chief Broadcast Engineer at the U. S. Army Broadcast Studios (who had processed the tapes through the device), testified:

"[T]he only thing we removed * * * was the noise between words. * * * [T]he noise suppressor's only function is to remove exactly what it says: noise * * * [I]f a signal is coming through and a man stops talking or an individual stops talking and there is noise in the background, it removes this noise, but only this noise * * *. This at no time is affecting the original tape."

and the copies which had been run through the noise suppressor. He then listened to the copies again while simultaneously following the written transcript prepared by Lt. Gracy. Both the original tapes and the copies relating to the phone calls were admitted; only the copy was played to the jury. The court found that none of the conversation had been filtered out, and appellants failed to respond to his request to demonstrate where any changes had been made. The tape of the apartment conversation was not admitted; noting the confused mixture of three or four voices and certain mechanical interference in the original recording, the court ruled that it could not be accurately determined whether the copy in fact accurately reproduced the conversations transcribed on the original.[5]

Lt. Gracy's transcripts were not admitted into evidence, but the jury was permitted to use them while the recordings were played. The trial judge indicated that he had determined for himself that the written version accurately reflected the recording, except for inaudible portions which were represented on the transcript by asterisks. Noting the inconvenience of frequently stopping the recording to permit a witness by oral testimony to identify the voice then speaking on the recording, the court ruled that the jury would be permitted to use the transcripts for the purpose of helping identify the speakers on the tapes. Appellants complain here of the introduction of the original tapes and of the copies and the use of the transcripts by the jury.

 Appellants claim the recordings were obtained in violation of their Fourth Amendment rights and the introduction of originals and copies was error. This objection is without merit. In Blanchard v. United States, 360 F.2d 318, 320 (5th Cir., 1966) we held, "While

there may be justification for a feeling of increasing distaste for the obtaining of evidence through listening to telephone conversations, * * *. Listening to a telephone conversation between an informant (who gave his consent to the 'listening') and the appellant by a Government agent is not such an invasion of a constitutionally protected area as to be a violation of the Fourth Amendment." We do not think Berger v. State of New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) now requires a different conclusion. In Berger, the Court made clear that statements in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) to the effect that " 'a conversation passing over a telephone wire' cannot be said to come within the Fourth Amendment's enumeration of 'persons, houses, papers, and effects' " are no longer valid and that a telephone conversation is within the protection of the Fourth Amendment. Use of electronic devices to capture it is therefore a "search" within the meaning of the Amendment; the inquiry must be whether there has been an *unreasonable* search prohibited by the constitutional provision. The Court's citation with approval of Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) makes clear that Berger was not meant to hold unreasonable the interception of a telephone conversation with the permission of one party where there has been no unlawful physical invasion of a constitutionally protected area. Only six months earlier, Mr. Justice Stewart, speaking for the Court in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, 382 (1967) had commented, "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." [6] See

---

5. One of the officers who monitored the conversation testified to its substance. No issue as to this testimony is raised before us.

6. See the concurring opinion of Mr. Justice Douglas in *Berger*, suggesting that if an individual unknowingly and because of the deception of the person to whom he

also Osborn v. United States, 385 U.S. 323, 87 S.Ct. 439, 17 L.Ed.2d 394 (1966). The recordings here involved were not obtained in violation of appellants' Fourth Amendment rights.

■■■■■■ Objection is raised to the reception in evidence of the copies on the grounds that no justification was shown for not using the original tapes, and that the noise suppression process may have eliminated part of the conversation, thus making the copies unreliable. We hold it was not necessary for the government to establish a physical defect in the magnetic tape on which the original recording was made to support the admission of the copies.[7] The existence of a significant degree of background noise which might well have interfered with the jury's ability to understand the substance of the conversations, plus the availability of a reliable method of removing the interference by making a copy and running it through the noise suppression device sufficiently justify the admission and use of the copy. The District Court found, and it is not seriously disputed here, that the copy was an accurate reflection of the conversations transcribed on the original tape. Considering the strong showing here of the accuracy and reliability of the copy and its value in making the conversations more easily discernible, its admission was not error.[8]

speaks is "put * * * on the radio" and utters words used subsequently to convict him, the subject's Fourth *and Fifth* Amendment rights have been violated. 87 S.Ct. at 1887. The majority did not reach the Fifth Amendment question urged by the petitioner. No Fifth Amendment issue was urged upon us in this case, so we need not specifically rule upon the matter. But we note that in rejected the contention that testimony by a witness to damaging admissions made to him by the accused at a time when the witness, unknown to the accused, was a government informer violated the Fifth Amendment privilege against compulsory self incrimination:

> [N]o claim * * * could be made that the petitioner's incriminating statements were the product of any sort of coercion, legal or factual. The petitioner's conversations with Partin [the informer] and in Partin's presence were wholly voluntary. For that reason, if for no other, it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated in this case.

87 S.Ct. at 414, 17 L.Ed.2d at 383. We feel that the same rationale applies when the challenged evidence is a recording of a conversation rather than the oral testimony of the other party to the conversation. See United States v. Beno, 333 F.2d 669 (2nd Cir.), cert. denied, 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 86 (1964); Todisco v. United States, 298 F.2d 208 (9th Cir., 1961), cert. denied, 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962).

7. See Monroe v. United States, 98 U.S.App. D.C. 228, 234 F.2d 49, 56 (1956). There was some evidence that the tapes on which the original recording was made would stretch with extended playing but were not fragile to the extent that they would break after repeated use. We need not discuss whether this alone would have been sufficient justification for admission of the copies.

8. Assuming but not deciding that the best evidence rule applies to recordings [a questionable assumption; see Johns v. United States, 323 F.2d 421 (5th Cir., 1963)], this holding does not run counter to the rule. It is clear that secondary evidence may be admitted where the original is too extensive for easy analysis (for example, an accurately prepared summary of extensive records) or where the original is illegible. See 4 Wigmore, Evidence §§ 1229, 1230 (3rd Ed., 1940). We have held that mechanical convenience for presentation to the jury is a sufficient ground to justify the introduction of a copy of a recording. In Johns v. United States, supra, an original wire recording was available but the volume could not be Hoffa v. United States, supra, the Court turned up loud enough for the jury to hear the recording. We affirmed the introduction of a copy, conceded to be accurate, in the form of a tape recording. Where a copy is proven accurate and serves to present the substance of the original in a more easily understood form, the spirit of the rule permits the admission of the copy. See generally, Ann., Admissibility of Sound Recordings As Evidence in Federal Criminal Trials, 10 L.Ed.2d 1169 (1964).

 Nor is appellants' objection to the use of the transcripts well taken. It is not seriously contended that the district court erred in its factual finding that Lt. Gracy accurately designated the speakers and correctly transcribed the words of the conversation. Unlike United States v. Schanerman, 150 F.2d 941 (3rd Cir., 1945) the record here contains an uncontested showing that Lt. Gracy was personally familiar with each of the parties to the recorded conversations and was able from experience to identify the voices. The jury was, somewhat belatedly, instructed to use the transcript for the limited purpose of identifying the voices.[9] But, it is asserted it nevertheless was error to permit use of the transcripts, however accurate they may have been, because this amounted to a prejudicial emphasis of the conversations, i. e., the cumulative effect of transcripts plus tape so emphasized the conversations that their probative value was inflated in the minds of the jurors. The task of the District Court was to weigh the danger of such over-emphasis against the inconvenience and confusion of stopping the tape between each speaker and permitting Lt. Gracy to identify the next speaker. We cannot say that he arrived at the wrong balance. Our conclusion is identical to that reached by the Fourth Circuit in a similar situation. United States v. Hall, 342 F.2d 849, 853 (4th Cir.), cert. denied, 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed. 2d 60 (1965). Cf. Lindsey v. United States, 332 F.2d 688, 691–692 (9th Cir., 1964).

The judgment is affirmed.

Rehearing denied; WISDOM, Circuit Judge and McRAE, District Judge, concurring.

---

9. During their deliberation the jury sent a message to the court asking that they be allowed to have the transcripts. Defense counsel requested, and government counsel opposed, a specific instruction at that time that the transcripts were not part of the evidence in the case. In declining the request of the jury, the district judge stated:

The transcripts were made and given to you at the time that you listened to the tapes for the purpose of identifying the persons who were speaking, and that was the only purpose the transcripts were made up for; [in regard to] the evidence that you listened to through the earphones, if we had not had the [transcripts] * * * it would have been necessary to stop at the end of every sentence to identify who the next speaker was * * *. [I]t is your recollection of the evidence that counts. It is going to be up to you to use your best powers of recollection with respect to the evidence.

While the better practice would have been to make clear to the jury at the time they were handed the transcripts the limited purpose for which the transcripts were being provided, we feel that the refusal to allow the jury to have the transcripts and the instruction then given adequately covered the matter.