Jeffrey L. BEARD, Appellant,

v.

UNITED STATES, Appellee.

No. 84–1803.

District of Columbia Court of Appeals.

Argued Oct. 13, 1987.
Decided Jan. 7, 1988.

 

 

 
 

 
 
 

 

 
 
 

 
 
 

 
 

 
 
 

 

 
 
 

 
 
 

Richard K. Gilbert, Washington, D.C., for appellant.

Elizabeth Trosman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Donald Allison,

Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

In appealing his conviction of assault with intent to commit robbery while armed (D.C. Code §§ 22–501, –3202), carrying a pistol without a license (*id.* § 22–3204), threatening to injure a person (*id.* § 22–2307), and obstructing justice (*id.* § 22–722), appellant contends, and we agree, that reversible error occurred when the trial judge denied appellant's request to be present at the bench during voir dire of individual jurors. Because we reverse and remand for a new trial, we address several evidentiary issues as well. We disagree with appellant's contention that, in the absence of evidence that a threat was intended to be communicated to the victim, there is insufficient evidence of the threats charge. We also disagree that his right to cross-examine witnesses was violated. We agree, however, that the trial judge erred in (1) his application of the marital privilege to statements made in the presence of a third person, (2) instructing, in the absence of objection, that a hearsay inconsistent statement was admissible only for impeachment, and (3) failing to determine, before admitting into evidence an "enhanced" tape recording, that the recording accurately reflects the original tape.

## I.

Appellant contends that the trial judge's refusal to allow him to approach the bench where prospective jurors were being examined on voir dire violated his right to be present at all stages of his trial. The government responds that the trial judge did not refuse access to the bench, but rather expressed no more than his preference that appellant remain at counsel table and appellant acquiesced.

1. SUPER.CT.CRIM.R. 43(a) provides:
 PRESENCE REQUIRED. The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including

Under SUPER.CT.CRIM.R. 43(a) a criminal defendant has the right to be present "at every stage of the trial including the impaneling of the jury." [1] Rule 43(a) "incorporates the protections afforded by the Sixth Amendment Confrontation Clause, the Fifth Amendment Due Process Clause, and the common law right of presence...." *Welch v. United States*, 466 A.2d 829, 838 (D.C.1983). This court has stated that the "importance of the defendant's presence at voir dire cannot be overemphasized" because "what may be irrelevant when heard or seen by his lawyer may tap a memory or association of the defendant's which in turn may be of use to his defense." *Boone v. United States*, 483 A.2d 1135, 1137–38 (D.C.1984) (en banc). A defendant's presence is necessary so that he may effectively exercise his peremptory challenges. *Id.* at 1138.

The disputed colloquy took place when counsel for both sides, appellant, and one juror approached the bench at the beginning of the first bench conference during voir dire, and proceeded as follows:

DEFENSE COUNSEL: Your Honor, I request that Mr. Beard be present for these conferences as well.

THE COURT: Why?

DEFENSE COUNSEL: So that he can assist me in voir diring this case.

THE COURT: You can go back at any time and tell him.

(Mr. Beard resumed his seat at the counsel table.)

The government's argument that this did not constitute a denial of counsel's motion for appellant's presence is unconvincing. The trial judge clearly did not grant defense counsel's request for appellant's presence, but instead pointed out the mitigating feature of the different arrangement which was to prevail. Indeed, in view of our then outstanding opinion in *Robinson v. United States*, 448 A.2d 853 (D.C. 1982), the most reasonable interpretation of

the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this Rule.

the judge's statement is that it was a denial of counsel's request. The government's suggestion that the judge was merely saying that defense counsel could confer with appellant whether appellant was at counsel table or the bench is belied by the plain language of the exchange. Nothing in the judge's comment implies that appellant had the option of standing at the bench.

Nor does the record indicate that appellant waived his right to be present at the bench. *Welch, supra,* 466 A.2d at 839 ("[A]ppellant's failure either to request that *he be present* during the portions of the proceedings which took place in his absence *or* to object to his exclusion therefrom constitutes a waiver of that right...." (Emphasis added)).[2] He made an unequivocal request for permission to stand at the bench. Once the trial judge denied the request, defense counsel did not have to argue with the judge in order to preserve the point on appeal. That the trial judge's response arguably was ambiguous does not mean defense counsel had to press his point more strongly in the face of what he reasonably interpreted as a denial of his unequivocal request. Under Rule 43(b) this court has held that before determining that a defendant's absence from trial is voluntary, the trial judge must find that defendant is intentionally relinquishing a known right. *Black v. United States,* 506 A.2d 1130, 1132 (D.C.1986) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). While no such finding need be made regarding presence at the bench in the absence of a request for presence or objection to exclusion, *Welch, supra,* 466 A.2d at 839, a rule similar to that enunciated in *Black* should apply where defendant has clearly asserted his right to stand at the bench. The denial of appellant's request under SUPER.CT.CRIM.R. 43(a) implicates rights guaranteed under the fifth and

sixth amendments. *Boone, supra,* 483 A.2d at 1139; *Robinson v. United States,* 448 A.2d 853 (D.C.1982). Here, where appellant approached the bench with his attorney, unequivocally asserted his right, and then retired to counsel table after the judge's response, if the trial judge was not denying the motion, it was his responsibility to determine whether appellant mistakenly interpreted his comment as a denial or was intentionally relinquishing the right he had clearly asserted only seconds before. Accordingly, whether the trial judge in fact intended to deny the motion, which is the fairest reading of the transcript, or failed to determine whether appellant understood he was not denying the motion, we hold error was committed here.

■ The question remains whether the error was harmless. *Boone, supra,* 483 A.2d at 1140; *Robinson, supra,* 448 A.2d at 856. Almost all of the voir dire questions were posed to the prospective jurors either as a group, in which case answers were presumed from silence, or to individual jurors at the bench. Thus appellant had practically no opportunity to hear any juror speak in open court. The bulk of the voir dire (forty-five pages of the transcript) occurred when twenty-three jurors approached the bench individually to answer questions regarding their ability to be impartial despite experiences as victims of, suspects of, or witnesses to crimes. Six persons who participated in these bench conferences eventually sat on the jury panel. Appellant's attorney exercised all ten of his peremptory strikes for jurors, and one of his two strikes for alternates.

Since virtually all of the voir dire was conducted at the bench, this case is governed by *Boone* and *Robinson,* and the error requires reversal of appellant's convictions. None of the factors which this court has relied on in other cases to find this error harmless [3] are present here since

---

**2.** *See also United States v. Washington,* 227 U.S. App.D.C. 184, 192, 705 F.2d 489, 497 (1983) ("unless a specific request is made for the defendant to participate at bench examinations of prospective jurors, such right shall be deemed to have been waived").

**3.** *See Gary v. United States,* 499 A.2d 815, 835 (D.C.1985) (en banc) (only two prospective jurors questioned at the bench actually served on panel, and defense counsel did not use one peremptory strike), *cert. denied,* 475 U.S. 1086, 106 S.Ct. 1470, 89 L.Ed.2d 725 (1986); *Young v. United States,* 478 A.2d 287 (D.C.1984) (only

the bulk of voir dire was conducted at the bench, half of the actual jury panel had been questioned in this manner, and defense counsel used all of his challenges for jurors. Accordingly we reverse and remand for a new trial.

## II.

■ Because several of the other issues raised by appellant will inevitably arise at the new trial, we address them now.[4] To do so we first summarize the relevant evidence.

According to the government's evidence, appellant was the instigator of an armed robbery of a laundromat on July 21, 1983. Appellant first tried to convince Joseph Wright to do the robbery, but when he refused appellant convinced Darryl Smith to do it. Appellant told other members of his group of friends to act as though they were doing their laundry at the time, and promised to give them drugs and some of the money if they participated.[5] Appellant gave Smith his pistol, told him how to grab the manager and to put a gun to his head, told Smith that once he was inside of the laundromat he should tell the people there that this was a holdup and to lie down, and told him where the money was located in the laundromat. Smith entered the shop with the gun drawn and announced the holdup, but the owner of the laundromat did not comply with Smith's order to lie down, and Smith ducked behind a machine, fired the gun and ran out of the shop. Two weeks later Smith told Detective Lyddane about the robbery, turned himself in and gave a written statement.

Smith entered into a plea agreement with the government, and, based on the information he provided, appellant was arrested on August 18, 1983. After his arrest, appellant began offering to pay people to hurt Smith to prevent him from testifying against appellant. Wright told Detective Lyddane that appellant was trying to keep Smith from testifying, and, in order to investigate, Lyddane instructed Wright to introduce appellant to undercover officer Alonzo Jacobs, who would pose as a hit man. Appellant met with Jacobs on August 6, 7 and 10, 1984. Appellant thereafter contracted with Jacobs to kill Smith for $150 before appellant's trial. When Jacobs showed appellant two photographs of Smith lying on the ground with stage blood on him as proof that the job was done, appellant acknowledged that the man in the pictures was the one he wanted killed, and paid Jacobs.

The defense presented testimony from appellant's sister and wife that Wright, rather than appellant, had schemed to have Smith killed, and from Michael Dillard, who testified that Wright asked him if he wanted to help set appellant up and bragged about his success after appellant was arrested.

### A. Threats

■ Appellant was charged with threatening to injure, "between on or about August 6 and 10, 1984," Darryl Smith in violation of D.C. Code § 22–2307.[6] On appeal, appellant contends that there was insufficient evidence to convict him because he did not intend or expect that Smith would find out about his plan to have Smith killed

---

limited portion of entire voir dire was conducted at bench, only two prospective jurors so questioned served on panel, and defense counsel did not use one peremptory challenge). *See also United States v. Washington,* 227 U.S.App.D. C. 184, 705 F.2d 489 (1983) (limited portion of voir dire at bench, and the two jurors questioned at the bench who actually served on the jury were questioned before defense counsel requested defendant's presence at the bench).

**4.** We do not address the claim of prosecutorial misconduct in rebuttal argument, since it is unlikely that the identical arguments, phrases, and words will be used after a new trial.

**5.** Wright characterized appellant as the leader of this group.

**6.** D.C. Code § 22–2307 provides:

Whoever threatens within the District of Columbia to kidnap any person or to injure the person of another or physically damage the property of any person or of another person, in whole or in part, shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

and, in fact, communicated no threats to him.

In *United States v. Baish*, 460 A.2d 38, 42 (D.C.1983),[7] this court held:

[A] person 'threatens' when she utters words, which are intended to convey her desire to inflict physical or other harm on any person or on property, and these words are communicated to someone.

\* \* \* \* \* \*

[T]o be subject to criminal prosecution, an individual must do more than utter a threat; the evidence must show that the threatening message was conveyed to someone—either to the object of the threat or to a third party. An uncommunicated threat, by definition, cannot threaten. A fortiori, a person making threats does not commit a crime until the threat is heard by one other than the speaker.

Appellant fails convincingly to explain why *Baish* is not controlling here.[8] The crime was complete as soon as the threat was communicated to a third party, regardless of whether the intended victim ever knew of the plot. Appellant's reliance on other language in *Baish*, 460 A.2d at 41, that "[t]he making of a threat entails three stages: utterance, transmittal, and communication," is misplaced. He argues that communication is more than transmittal and should require that the threat be communicated to the intended victim subject to the qualification in *Gurley v. United States*, 308 A.2d 785, 787 (D.C.1973).

The three-stage analysis mentioned in *Baish* is contained in a paragraph discussing the government's theory of the case, rather than the court's own views, and

even if the court had adopted this view, the analysis does not support appellant's position. Even granting that a threat must be uttered, transmitted, and communicated, it does not necessarily follow that the communication must be to the intended victim rather than to a third party. *See, e.g., Postell v. United States*, 282 A.2d 551, 553 (D.C.1971) (words must be "of such a nature as to convey a menace or fear of bodily harm to the ordinary hearer.") (*cited in Baish, supra*, 460 A.2d at 42 & n. 5). In short, *Baish* rejected appellant's definition of communication in defining the elements of the offense. 460 A.2d at 42. Here, moreover, Jacobs testified that he was sufficiently fearful that the intended victim's life "would be in jeopardy," *see State v. Hamre*, 247 Or. 359, 365, 429 P.2d 804, 807–08 (1967) (special concern by hearer for welfare of intended victim), and appellant concedes that the statute is violated when a person "pointedly tells[ ] a potential witness about plans to harm another witness" and has reason to believe the hearer will be upset or intimidated.[9]

▇▇ Nor can we agree with appellant that the interpretation of the statute adopted in *Baish* violates the first amendment. In the context of a business transaction aimed at hiring someone to kill a third party, the words threatening the intended victim's life are not constitutionally protected. *See Rankin v. McPherson*, —— U.S. ——, 107 S.Ct. 2891, 2898, 97 L.Ed.2d 315 (1987) ("a statement that amounted to a threat to kill the President would not be protected by the First Amendment"); *cf. Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969)

---

7. The *Baish* court was interpreting D.C. Code § 22–507, a misdemeanor, which prohibits the same conduct as D.C. Code § 22–2307, a felony. *United States v. Young*, 376 A.2d 809, 814 (D.C. 1977).

8. Appellant's reliance on the legislative history referred to in the dissenting opinion in *United States v. Young*, 376 A.2d 809, 815 (D.C.1977) (Mack, J., dissenting), does not assist his argument. The requirements of the language on which he relies ("threats designed to influence conduct" and "intended to be acted upon, against particular persons") is met by the evidence in the instant case. Moreover, the dissent

addressed only whether specific intent to extort was required by § 22–2307. *Id.* at 814. *Ball v. United States*, 429 A.2d 1353, 1359 (D.C.1981), on which appellant also relies, held only that double jeopardy did not bar prosecution of the threats convictions since they did not merge into the obstructing justice charges.

9. Because *Baish* is controlling, appellant's contention that the trial judge's instructions were defective for failure to state that the threat must be conveyed to the intended victim necessarily fails.

(demonstrator's remark that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." did not amount to a threat to kill the President given its context (political rally), the reaction of the listeners (laughter), and the expressly conditional nature of the statement).

## B. *Right of Confrontation*

*Prior Plea Agreement.* Appellant also contends that it was error to prohibit cross-examination regarding the withdrawal and renegotiation of Smith's guilty pleas, because this information, and only this information, would show the government's great exertions to prevent Smith from being incarcerated. We find no abuse of discretion by the trial judge.

On December 8, 1983, after being arrested for assault with intent to rob while armed, Smith entered into a plea agreement with the government. The terms of the agreement were that (1) Smith would plead guilty to the lesser offense of assault with intent to rob and to carrying a pistol without a license; (2) he would testify truthfully in any criminal proceeding arising from the attempted robbery; (3) the government could control his sentencing date; (4) the government could ask that he receive a jail term as part of his sentence; *and* (5) the government would inform the court of his cooperation at his sentencing hearing. Smith's sentencing was set for October 9, 1984, the same day appellant's trial was scheduled to start. At the sentencing hearing before Judge Bowers both parties asked the judge to reschedule sentencing until after appellant's trial so they could each reap the benefits of their plea bargain. When Judge Bowers denied the continuance, both parties moved to vacate the guilty plea. The next day they entered into a new plea agreement which was identical to the old one except there was no statement regarding prosecutorial control over the date of sentencing. Before Smith testified at appellant's trial, Chief Judge Moultrie ruled that while defense counsel could cross-examine Smith regarding the existence and terms of his plea agreement, counsel could not cross-examine him regarding the sentencing hearing, the withdrawal of the first plea, or the negotiation of the second agreement.

■ "[T]he trial court should permit exploration of all matters that contradict, modify, or explain testimony given by a witness during direct examination." *Goldman v. United States*, 473 A.2d 852, 857 (D.C.1984). "Because even a proper plea agreement may signal a witness' willingness to curry favor with the government by coloring the truth for the benefit of the prosecution, due process requires full disclosure of the terms of the agreement to the jury as an aid to evaluating the witness' credibility." *Hawthorne v. United States*, 504 A.2d 580, 587 (D.C.), *cert. denied*, — U.S. —, 107 S.Ct. 593, 93 L.Ed.2d 594 (1986). This right to explore bias on cross-examination is not unlimited; it is within the trial court's discretion to prevent repetitive or cumulative cross-examination. *Sherer v. United States*, 470 A.2d 732, 737 (D.C.1983), *cert. denied*, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984). When this court determines that the cross-examination allowed was consistent with the defendant's sixth amendment right to confront the witnesses against him, we will focus on the scope of cross-examination allowed, and will not reverse the trial court's determination absent an abuse of discretion. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Springer v. United States*, 388 A.2d 846, 856 (D.C.1978).

■ At trial, the prosecutor questioned Smith on direct examination regarding the existence of the plea agreement and some of its terms (the guilty plea to a lesser offense and the agreement to testify against appellant). Defense counsel cross-examined Smith regarding his plea agreement, the fact that he would be sentenced after testifying against appellant, and the fact that the prosecutor would speak on his behalf at sentencing because of his cooperation. In closing argument, defense counsel pointed out to the jury that Smith's bias stemming from his incentive to curry favor with the government tainted his credibili-

ty.[10] Thus Smith's potential bias was thoroughly explored before the jury, and appellant's right to confront the witnesses against him was protected.

Appellant contends nonetheless that it was error to forbid cross-examination concerning the sentencing hearing and first plea agreement because the prosecutor's actions at the hearing showed an intention to assure that Smith would never go to jail at all, a fact which was not spelled out in the written agreement. This error was exacerbated, appellant claims, by allowing the prosecutor to elicit from Smith on redirect that in the agreement the government explicitly reserved the right to ask for a jail sentence, when in fact the prosecution had no intention of making such a request. However, the government did explicitly reserve this right, and events at the sentencing hearing did not belie this term of the written agreement. It is clear that in jointly asking for the guilty plea to be vacated at the original sentencing hearing both parties were motivated by a desire to postpone sentencing until after Smith had testified, thereby ensuring that they could each reap the benefits of the plea agreement. The government's actions did not evince a determination that Smith should never have to go to jail, and thus there was no unwritten term of the plea agreement which counsel was forbidden to ask about on cross-examination. The trial judge could reasonably conclude that any testimony regarding the hearing and the first agreement, which was virtually identical to the second agreement, would therefore have been cumulative to the testimony regarding the second agreement. That we might agree with appellant that "full disclosure of terms" can encompass a prior plea agreement in order to focus on the subjective state of the witness, cf. Goldman v. United States, 473

A.2d 852, 857 (D.C.1984); Washington v. United States, 461 A.2d 1037, 1038 (D.C. 1983)—here that Smith would benefit by a delayed sentencing—we are satisfied that the trial judge did not abuse his discretion in limiting cross-examination on this issue.[11]

■ Witness' Police Relationship. Appellant also claims that the trial judge erred in disallowing further evidence of government witness Joseph Wright's bias, through greater exploration of his relationship with the police. Officer Jacobs' rough notes of the events of August 6, 1984, state that while he and Wright[12] were waiting outside appellant's home, Wright had a conversation with a woman named Donna concerning drug dealing. Officer Jacobs' official report, however, refers only to a "private conversation," rather than one specifically concerning drugs. Appellant contends, as he did at trial, that because the police knew of Wright's drug dealings and did nothing, Wright was getting something for his efforts as an informant. Appellant hypothesizes that Wright struck a plea bargain regarding a possession of marijuana charge of which he was convicted in January, 1984.

The record does not support appellant's claim. On direct examination, Wright testified that he had a 1974 conviction for possessing a concealed weapon and a 1975 conviction for attempted robbery in addition to the 1984 marijuana conviction. Wright also testified that the government had made no promises to him before his grand jury testimony. On cross-examination, the trial judge allowed defense counsel to ask Wright whether his testimony before the grand jury was taken before or after the marijuana charge pending against

**10.** In his closing argument defense counsel stated: "And this case proceeds to trial with, of course, Mr. Smith getting the benefit of waiting until after this case, his matter pending now for nearly 14 months, before he's even going to have to plead guilty in the case."

**11.** Appellant's reliance on United States v. Masino, 275 F.2d 129 (2d Cir.1960) is misplaced. In Masino, the district judge curtailed all exploration of the fact that state court charges against

one of the government's key witnesses had been quashed upon the intercession of the same Assistant United States Attorney who was prosecuting defendant's case. Here, by contrast, everything Smith had gained and hoped to gain by cooperating with the government was presented to the jury.

**12.** Wright is referred to as "CS," which indicates that he is a "confidential source."

him was resolved, and whether he had made any agreements with the government.[13] After eliciting equivocal testimony from Wright regarding the chronology of events, counsel did not ever ask him whether he struck a deal with the government regarding the drug charge.[14] The trial judge's ruling was proper, and does not become erroneous because counsel failed to ask the appropriate question.

■ It is also unclear why counsel failed to ask Officer Jacobs about the discrepancy between his notes and his formal report, and whether a deal with Wright was the explanation, choosing instead to elicit this information exclusively through Detective Lyddane. Lyddane testified before the jury that Wright had given him information in one other case, and that he had no motive to protect Wright. Out of the jury's presence, Lyddane testified that he did not assist Jacobs in preparing his report, did not tell Jacobs to sanitize the report, and that if Wright had actually been dealing drugs in the officers' presence, the police would have "locked him up." Since this testimony did not support appellant's theory of the relationship between Wright and the police, its relevance seems minimal, and the trial judge was well within his discretion to prevent bringing it before the jury. *Springer, supra,* 388 A.2d at 855. Wright's bias and credibility were fully explored since the jury heard testimony regarding his status as an informant and his record of convictions.[15]

### C. *Marital Privilege*

■ Appellant also contends the trial judge erred in excluding portions of Jacqueline Beard's testimony. The trial judge apparently excluded the testimony based on the marital privilege. *See* D.C. Code § 14–306 (1981). The government does not argue that the testimony properly comes within the marital privilege, but that, assuming the exclusion was erroneous, the error was harmless. These rulings were erroneous since at least one person besides appellant and his wife was present when the conversations took place. *Morgan v. United States,* 363 A.2d 999, 1004 (D.C. 1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977); *People v. Torres,* 18 Ill.App.3d 921, 927–28, 310 N.E.2d 780, 784–85 (1974). Since we reverse on other grounds we need not decide whether the error was harmless.

### D. *Inconsistent Statements*

Appellant's claim of instructional error relating to Vineca Harrison's testimony also deserves brief treatment. The government does not argue that Harrison's testimony that Wright told appellant "we are going to get him hushed up" should not have been considered by the jury for its substantive content. Rather, it argues that the statement was in fact admitted for its substance because it was not inconsistent with Wright's testimony that he had never said he wanted Smith "hurt or taken care of." Thus, the argument continues, the trial judge's jury instruction that inconsistent statements are admitted for purposes of evaluating credibility only did not apply to Harrison's testimony. We disagree and find that these are inconsistent statements, and therefore that the instruction to the jury did apply.

■ At trial, defense counsel argued that the overheard remark, which

13. Appellant's reliance on *Washington v. United States,* 461 A.2d 1037 (D.C.1983) is misplaced. In that case the trial judge disallowed any bias cross-examination regarding a pending criminal charge. Here, by contrast, defense counsel was allowed to cross-examine the witness as to whether the marijuana charge was in fact pending when he first testified, and whether he had struck a deal with the government.

14. The prosecutor represented to the trial judge that there was no agreement regarding the drug charge.

15. We decline to address appellant's argument regarding new evidence of a pending warrant for Wright's arrest because appellant did not file a notice of appeal from the trial court's denial of his motion for a new trial based on this evidence. D.C.App.R. 4(b)(1); *United States v. Jones,* 423 A.2d 193, 196 (D.C.1980) (requirement of timely filing notice of appeal is mandatory and jurisdictional).

Wright assertedly made to appellant in Hannon's presence, was admissible for its substantive content as bearing on appellant's state of mind. *See* McCormick's Handbook of the Law of Evidence § 249, at 589–90 (E. Cleary, 2d ed. 1972). The trial judge made no ruling. However, the judge denied the prosecutor's request that the jury be given a cautionary instruction that the evidence was admissible solely for impeachment purposes. Defense counsel preserved his objection during discussions on the general instructions to the jury, but in instructing the jury on inconsistent statements, the judge did not focus the jury's attention on any particular testimony. On appeal the government argues that the statements were not inconsistent. Absent an objection to the admission of Hannon's testimony, concerning a second overheard remark, as substantive evidence, *see Turner v. United States*, 443 A.2d 542, 549–50 (D.C.1982); *Wilson v. United States*, 357 A.2d 861, 864 (D.C.1976); *see also Deer Island Ass'n v. Trolle*, 181 Conn. 201, 202–03, 435 A.2d 10, 11 (1980), appellant was entitled to use it as substantive evidence and not simply for purposes of impeachment. Hence the trial judge should have advised the jury either that it was free to consider that testimony as substantive evidence or identified the statements which were inconsistent.

### E. *Enhanced Tape Recording*

Appellant's final contention is that the trial judge erred in admitting a copy of the microcassette recorded by undercover officer Jacobs at one of his meetings with appellant which had been "enhanced" by the FBI in order to make the recorded conversation more audible. He contends that in the absence of expert testimony concerning the enhancement process, the government failed to lay a proper foundation.

 Admission of tape recordings is within the sound discretion of the trial

court. *Springer, supra*, 388 A.2d at 852. The trial judge must determine whether the government has shown by clear and convincing evidence that the tapes are authentic, accurate, trustworthy and audible. *Id.* The fact of some inaudibility does not require exclusion. *Id.* As to "enhanced" tapes specifically, in *Fountain v. United States*, 384 F.2d 624, 631 (5th Cir.1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968), the trial judge found, where the person who processed the tapes testified at trial, that a copy of a tape which had been run through a noise suppression device accurately reflected the conversations on the original tape. 384 F.2d 629 & n. 4, 630. On review, the Fifth Circuit Court of Appeals held that the existence of significant background noise, plus the availability of a reliable method of removing it, justified admission and use of the copy. *Id.* °at 631; *see also United States v. Madda*, 345 F.2d 400, 403 (7th Cir.1965).

 Officer Jacobs explained that the original tape he made during his conversation with appellant was sent to the FBI to be re-recorded so that the "sound of the conversation [could be] increased." He testified that he had heard the enhanced tape, and that it was a duplicate of the original. Jacobs did not testify how he determined that the tapes were exact duplicates. Both tapes were admitted into evidence, but only the enhanced tape was played for the jury. We follow the lead of *Fountain, supra*, and hold that upon remand the trial judge must determine whether the enhanced tape accurately reflects the original before admitting the enhanced tape into evidence.

Accordingly, the judgment is reversed and the case remanded.

TERRY, Associate Judge, concurring:

I remain unrepentant in the view that the *Boone* and *Robinson* cases [1] were wrongly decided.[2] I recognize, however, that they

---

**1.** *Boone v. United States*, 483 A.2d 1135 (D.C. 1984) (en banc); *Robinson v. United States*, 448 A.2d 853 (D.C.1982).

**2.** I agree in substance with Judge Kern's dissenting opinion in *Boone*, 483 A.2d at 1145–1149.

are binding authority under *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). Given that premise, I concur in part I of Judge Rogers' opinion for the court. I join without reservation in the remainder of Judge Rogers' opinion.