**Wilmer T. DIXON, Appellant,**
v.
**UNITED STATES of America,**
**Appellee.**
No. 20623.

United States Court of Appeals
Fifth Circuit.
June 24, 1964.

Thomas M. Haas, Mobile, Ala., for appellant.

Vernol R. Jansen, Jr., U. S. Atty., William A. Kimbrough, Jr., Asst. U. S. Atty., Mobile, Ala., for appellee.

Before BELL, Circuit Judge, and INGRAHAM,\* District Judge.

INGRAHAM, District Judge.

Appellant Dixon was charged in a three count indictment returned April 10, 1963, as follows:

Count One: Charged jointly with George William Runyan with falsely making $78,380 in counterfeit $10 Federal Reserve Notes. (Violation of Sec. 471, Title 18, U.S.C.)

Count Two: Charged with possession of $490 in counterfeit $10 Federal Reserve Notes. (Violation of Sec. 472, Title 18, U.S.C.)

Count Three: Charged with possession of $77,890 in counterfeit $10 Federal Reserve Notes. (Violation of Sec. 472, Title 18, U.S.C.)

Runyan, charged in count one only, pleaded guilty thereto. Dixon pleaded not guilty, was tried and convicted by the jury of count three only.

Evidence adduced at the trial was substantially as follows.

In April, 1962, Wilmer Troy Dixon, the appellant, rented office space from Mr. Runyan where he managed Southern Pawnbrokers, a loan company. In this same building Runyan maintained a small printing shop. The appellant and Runyan came to know one another. As a result, the appellant learned of Runyan's proficiency in the printing profession and of the location of his printing shop in Mobile.

Shortly after their first meeting, Dixon began to express to Runyan an interest in the offset lithograph method used by printers to reproduce a piece of paper containing written matter, patterns or designs. Subsequently the appellant suggested the possibility of reproducing Federal Reserve Notes, and in the summer of 1962 the appellant and Runyan did reproduce a $10 Federal Reserve Note at Runyan's print shop on 4 South Ann Street, Mobile, Alabama. Then at appellant's suggestion Runyan obtained a high-grade paper and with the assistance of appellant, Runyan ran off approximately 10,000 counterfeit $10 Federal Reserve Notes, using seven or eight different serial numbers. Then in the middle of December, 1962, Runyan gave this counterfeit money in bundles to appellant to be burned. During a later conversation between appellant and Runyan, appellant informed Runyan that the counterfeit notes had been destroyed.

On the 15th or 16th of January, 1963, appellant had a conversation wih government witness William F. Grosz relative to the counterfeit $10 bills. He commented that Grosz appeared to be short of money and suggested a remedy for this situation. He proceeded to take out approximately seven counterfeit $10 bills for Grosz's inspection. This conversation took place at the Southern Pawnbroker's when Grosz went in to make a payment on a loan he had obtained there.

---

\* Judge Cameron, the third judge constituting the Court originally hearing this case, died after argument but before decision.

Consequently, this decision and opinion is rendered by a quorum pursuant to Title 28 U.S.C.A. § 46(c) and (d).

At this time Grosz agreed to attempt to pass these bills and appellant and Grosz agreed to meet later so that appellant could deliver additional counterfeit bills to Grosz. Appellant gave a total of $1,000 in counterfeit Federal Reserve Notes to Grosz, instructed him to go to New Orleans, Louisiana, for passing these notes and advised him that the money obtained by this endeavor would be split three ways. That is, appellant was to receive one-third of the take, Grosz one-third and appellant was to deliver to his supplier one-third of any amount obtained.

On January 22, 1963, Grosz went to New Orleans, Louisiana, via airplane, having in his possession $980 in counterfeit $10 bills. Two of the bills delivered to him had been destroyed as they were torn as a result of treatment with a coffee solution prior to delivery to Grosz.

In New Orleans Grosz proceeded to the race track. He attempted to buy an admission ticket with one of the counterfeit notes, but became afraid, took the counterfeit bill back and paid $1.40 for this ticket. This action apparently alerted the ticket officer for Grosz was apprehended shortly after throwing the counterfeit money into a garbage can there at the fairgrounds.

He was then taken into custody by federal officers in Louisiana. From this time on Grosz acted under instructions of Secret Service agents.

On the 25th day of January, 1963, Grosz, after having his person and automobile searched by Secret Service agent Guthrie, returned to Southern Pawnbrokers where appellant delivered an additional $490 in counterfeit $10 Federal Reserve Notes to him. He was observed going into and returning from this building by Secret Service agents. After obtaining these counterfeit bills, Grosz went directly to the pre-arranged meeting place and delivered these counterfeit bills to Secret Service agent Guthrie.

On January 29, Grosz received $50 in United States currency from agent Guthrie to be delivered to appellant to prevent his suspicions being aroused. Again on January 31, agent Guthrie supplied Grosz with $110 in marked money which was delivered to the appellant. On February 4, 1963, Secret Service agent Guthrie recovered one of these marked bills from the appellant's wife.

On February 2, the appellant informed Grosz that he was under investigation by federal authorities and that he would have to lay off his illegal activities.

Then on February 4, 1963, appellant requested Grosz to meet him at a point in Prichard, Alabama. At this time appellant said that the situation was real hot and that he had to get rid of the counterfeit money in his possession. Appellant further told Grosz how to treat the paper with a solution of coffee to give it the appearance of real currency. Appellant then directed Grosz to drive him to his car to pick up approximately $80,000 in counterfeit $10 Federal Reserve Notes. Appellant cautioned Grosz to make sure he was not being followed. They arrived at appellant's car and appellant delivered to Grosz a box containing the counterfeit bills listed in Count Three of the indictment. Appellant was dropped off at a local tavern. Shortly thereafter Grosz called Secret Service agent Guthrie informing him of the happenings. Grosz, at the agent's request, met Guthrie at the Federal Building in Mobile, Alabama, and turned over to him the bogus money he had been given by appellant.

We treat in this opinion only the appellant's Sixth Specification of Error:

"THE COURT ERRED IN DENYING THE APPELLANT THE RIGHT TO CROSS-EXAMINE A WITNESS."

We believe the other errors claimed are matters within the broad areas of judicial discretion.

Both Runyan and Grosz were witnesses for the prosecution. Credibility of both witnesses was brought into issue by Dixon.

Dixon took the stand as a witness. He denied the incriminatory portions of the

testimony just outlined. He admitted meeting Grosz in February of 1963, and claimed that Grosz had with him "several packages" of counterfeit money. Dixon claimed that he refused to have anything to do with the counterfeit notes.

A rebuttal witness, Lister, (now a prisoner at the federal penitentiary in Atlanta), who was arrested in New Orleans with counterfeit $10 notes, testified that he obtained them from Dixon.

Thus, in its present posture, the conviction on Count Three must stand or fall on the testimony of Grosz, buttressed, perhaps, by the testimony of others relating primarily to counts on which the jury declined to convict, considered as circumstantial evidence.

The most serious issue in this trial arose at the very end of the proceedings, after arguments of counsel and the charge of the court. After 37 minutes deliberation, the jury returned to open court and the following transpired:

"JUDGE THOMAS:

"Somebody said you wanted to ask a question.

"JUROR:

"Yes, sir, one thing that we discussed, that was brought out in the testimony, as to whether Mr. Guthrie had examined Mr. Grosz, I believe it was, to see if he had any of the counterfeit money on him prior to meeting Mr. Dixon, and they immediately searched him afterwards, and found this money on him. We want to know if that was Mr. Guthrie's testimony.

"JUDGE THOMAS:

"I will have Miss Gerhardt check it and will give you the answer. I think this. I think you may as well recess for the night and come back at 9:30 in the morning."

In the morning, these proceedings took place:

"JUDGE THOMAS:

"Speaking to the Jury in the Dixon case, when I recessed last night, you stated you wished to ask some questions. You specifically wanted to know whether Mr. (300) Guthrie testified that he searched Mr. Grosz before his meeting with Dixon. He did not so testify. Is that correct, Miss Gerhardt?

"MISS GERHARDT:

"I read Mr. Guthrie's entire testimony and he did not so testify.

\* \* \* \* \* \*

"JUROR:

"Who searched Mr. Grosz before he went in and when (301) he came out? That is what I want to know. Who is the party that did that?

"JUDGE THOMAS:

"I am going to try to get your question answered, but what I don't want to do is to re-open the case and start retrying it all over again. I am going to ask Mr. Guthrie one or two questions. Give both sides an objection, Miss Gerhardt. Mr. Guthrie, remain where you are, please. Did you search Grosz before his meeting with Dixon?

"A. Yes sir, on January 25th, your Honor.

"JUDGE THOMAS:

"Where did you search him?

"A. At the room in the Seamen's Club, located about two blocks from here.

"Q. (Judge Thomas continuing) What time of day was it?

"A. It was approximately 2:30, your Honor, and the meeting was approximately 3:00 o'clock, and I followed him.

"Q. Now, wait a minute. You just answer the questions.

"A. Yes, sir.

"Q. Did you search him later?

"A. No, sir, I did not physically search him on his return from the meeting.

"Q. What did he turn over to you?

"A. $490.00 in counterfeit currency.

"(302)  Q.  What time of day or night was that?

"A.  This was approximately 3:30, your Honor, possibly twenty-five minutes to 4:00.

"Q.  You searched his person in a room in the Seamen's Club.  About what time was that?

"A.  That was around 2:30.

"Q.  Did you search his automobile?

"A.  Yes, sir, the interior of his automobile.  I did not look in the trunk.

"JUDGE THOMAS:

"Does that answer your question?

"JUROR:

"Yes, sir.

"MR. HAAS:

"The defendant excepts to the re-opening of the case, after all of the case has been completed and arguments of counsel and charging the Jury in this matter.  In addition, I would like to have the opportunity to cross examine Mr. Guthrie, since he has testified here again.

"JUDGE THOMAS:

"Mr. Haas, you are quite right in registering your objection.

"JUDGE THOMAS:

"Let me see Mr. Haas and Mr. Jansen just a minute.

"JUDGE THOMAS:

"Mr. Guthrie, in this search of Grosz, in the (303) Seamen's Club, was anyone present except you and Grosz?

"A.  No, sir.

"Q.  (Judge Thomas continuing) Did you make him strip his clothes off?

"A.  No, sir, he didn't strip his clothes off, but he took his coat off, and I had him to empty everything out of his pockets.  I looked to see that he had everything out of his pockets, and I looked to see whether or not he could have anything secreted anywhere on his person.  I

did not have him take his clothes off, however.

"Q.  On the search of his automobile, I understand you did not search the trunk?

"A.  That is true, sir.

"Q.  On the interior of the car, what search did you make?

"A.  I looked in his glove compartment, under the dash, under the seats?

"Q.  Did you remove the seats?

"A.  No, sir, I did not.

"Q.  The upholstery, was it cut open in any way?

"A.  No, sir, I did not remove any of the upholstery.

"(304) MR. HAAS:

"If the Court please, the defendant respectfully excepts to the denial of cross-examination, and I ask the right to re-argue the case.

"JUDGE THOMAS:

"Overruled.

"MR. HAAS:

"Exception."

At 9:45 a.m. the jury retired again, returning with a conviction on Count Three at 11:20 a.m.  Dixon raised the constitutional question that he was deprived of his right to cross-examine Agent Guthrie when Guthrie was recalled by the trial judge after the jury began its deliberations.

DISCUSSION

The trial judge was not without historical precedent when he re-opened the case, after its submission to the jury, and refused to permit counsel to participate in further questioning of the witness.  See Virginia v. Zimmerman, 1 Cranch C.C. 47 (1802), Fed.Cas.No.16,-968, 28 Fed.Cas. 1227; and United States v. Greenwood, 1 Cranch C.C. 186 (1804), Fed.Cas.No.15,260, 26 Fed.Cas. 36.  But the modern view requires the trial judge "to exercise extreme care in reopening the case for the introduction of further testimony * * *." (Henry v. United

States, 6 C.A.1953, 204 F.2d 817, 821) and the abbreviated reports in Federal Cases often leave much to be desired in describing the setting in which a particular issue arose.

As the appellee points out in its brief, this court has declined to reverse the conviction when a trial judge refuses to permit re-cross-examination after a portion of the record has been played back to the jury. Easley v. United States (5 C.A.1958), 261 F.2d 276. Easley's case is not comparable to Dixon's. In Easley, no further testimony was given. The jury simply re-heard testimony given earlier, a permissible practice. In other factual settings, however, convictions have been reversed because of the trial court's refusal to permit re-argument after new issues arose (Loveless v. United States, 1958, 104 U.S.App.D.C. 157, 260 F.2d 487) or have affirmed convictions only because the defense was given an opportunity to present its case anew after the introduction of new evidence (Morgan v. United States, 1961, 111 U.S.App.D.C. 127, 294 F.2d 911, 913).

Most of these cases in which the parties are permitted to re-open involve an omission "through mere inadvertence" (Simsirdag v. United States (5 C.A. 1963), 315 F.2d 230, 231) or evidence presented "by consent of the parties or in relation to some non-controverted matter essential to a complete record." Henry v. United States (6 C.A.1953), 204 F.2d 817, 820.

■■ Some of these cases, however, involve something more than the mere reading back of testimony, or playing back of electronically transcribed testimony, or supplementing a record by the formal introduction of exhibits which have been identified and discussed throughout the trial. In this case, for instance, the court reporter announced in open court that the question of particular concern to the jurors, during their deliberations, had not been settled by the testimony. Under these circumstances, the abrupt curtailment, or indeed denial, of a right to cross-examine the witness

in question assumes particular significance because "[i]t is often stated that the control of cross-examination is within the discretion of the trial judge, but it is only after a party has had an opportunity substantially to exercise the right of cross-examination that discretion becomes operative." Lindsey v. United States, 1942, 77 U.S.App.D.C. 1, 133 F.2d 368, 369.

"A full cross-examination of a witness upon the subjects of his examination in chief is the absolute right, not the mere privilege, of the party against whom he is called, and a denial of this right is a prejudicial and fatal error. It is only after the right has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary." Heard v. United States, 8 C.A.1919, 255 F. 829, 832.

■ The appellee contends that "the matter brought out after the case was re-opened related to Count Two of the indictment" and argues that "any error on reopening can amount to no more than harmless error." When cross-examination is involved, the defendant need not show that he would win his case if permitted the right denied him. *"Cross-examination of a witness is a matter of right.* (emphasis supplied) * * * Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply." Alford v. United States, 282 U.S. 687, 691–692, 51 S.Ct. 218, 219, 75 L.Ed. 624.

■■ In this case it is not necessary to rely solely upon the constitutional consequences of the trial judge's denial of cross-examination. The testimony adduced without benefit of cross-examination tends to enhance the credibility of Grosz, even though it relates to a count of the indictment not now involved in this appeal. "The right of a defendant in a

federal court to confront the witnesses against him, guaranteed by the Sixth Amendment, includes the right to test the truth of those witnesses' testimony by cross-examination." United States v. Cardillo (2 C.A.1963), 316 F.2d 606, 610.

The judgment of conviction is, therefore, reversed.