

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00758-CR

Jordan Alexander **EATON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2023CR8146
Honorable Joel Perez, Judge Presiding

Opinion by:  Rebeca C. Martinez, Chief Justice

Sitting:  Rebeca C. Martinez, Chief Justice
H. Todd McCray, Justice
Velia J. Meza, Justice

Delivered and Filed: December 23, 2025

REVERSED AND REMANDED

Jordan Alexander Eaton appeals from judgments convicting him on and sentencing him for

one count of murder, a first-degree felony, *see* TEX. PENAL CODE ANN. § 19.02, for fatally shooting

Valentin Gonzales, and one count of aggravated assault with a deadly weapon, *see id*. at

§ 22.02(a)(2), a second degree-felony, for shooting at Brittany Gonzales, Valentin's wife.  In eight

issues, which we reorder and reclassify as four, Eaton complains that: (1) the instruction on the

defense of third person was erroneous and constituted a comment on the weight of the evidence;

(2) the exclusion of evidence relating to Valentin's "violent character" constituted a violation of the Confrontation Clause of the U.S. Constitution and an abuse of discretion; (3) the admission of a six-second video of him in a white jail jumpsuit while handcuffed and escorted by two police officers was unduly prejudicial; and (4) the admission of statements relating to Derek Sherrod, an individual at the scene of the shooting, was a Confrontation Clause violation and an abuse of discretion. We reverse and remand.

## I. BACKGROUND

At trial, Eaton testified that on the morning of December 30, 2021, he took his puppy to the courtyard in his apartment complex. At the time, Eaton was eighteen years old and living in an apartment with his girlfriend. Brittany and Valentin were also in the apartment complex courtyard. Brittany began petting Eaton's puppy, and Eaton told her to stop. A cellphone video and audio recording of the incident (the "shooting video") captured from the third floor looking down into the courtyard was admitted into evidence. It shows Eaton and Valentin close to each other and Brittany and Eaton's puppy a little farther away. Eaton and Valentin can be heard arguing. Then, Eaton pulls out a handgun. As the argument escalates, Eaton walks toward Brittany and fires one shot. Eaton insisted that he aimed his handgun toward the ground. Valentin then struck the back of Eaton's head and jumped onto Eaton's back. Eaton pointed his handgun toward Valentin, and a second shot is discharged. The second shot hit the left side of Valentin's torso. Valentin spun Eaton around and toward the ground, then a third shot is fired, this time into Valentin's chest. While on Eaton's back, Valentin pushed Eaton onto his knees and into the ground. Valentin continued to wrestle Eaton for control of the gun, but the two soon decoupled. Eaton got up, and he put back on his red slides and glasses. Eaton is heard yelling in a deep voice, "I told y'all what would happen! I warned you! I warned you!" Meanwhile, Derek Sherrod

approached Eaton, and the two briefly spoke — though their conversation was not captured on the recording. Towards the end of the recording, Sherrod is seen taking Eaton's handgun and walking out of the apartment complex's courtyard.

Brittany testified that she and Valentin were spending the holidays with her mother, Priscilla Clark, who lived in the apartment complex. On the morning of December 30, 2021, Brittany and Valentin took their children to the courtyard to play. Brittany then noticed Eaton come down from his third-story apartment to walk his dogs. As the children were playing on the opposite side of the courtyard, Valentin and Eaton got into a verbal argument. At one point, Eaton pulled up his t-shirt and pulled out a handgun from his pants. Upon seeing the gun, Brittany had Clark take the children back into Clark's apartment. Eaton and Valentin then argued, with Valentin telling Eaton to "put his gun down and fight like a man." In the shooting video, Eaton is seen holding his handgun and telling Valentin, "you want to live your life, go back to your own house." Other parts of Eaton's statements are difficult to understand, but Valentin responds, "I'll beat your ass. I don't need money to beat your ass. I promise you that." Brittany recalled that the bullet Eaton shot near her and his puppy went right past her ear and that the shot left her partially deaf in her left ear. After the altercation ended, Valentin walked to a nearby apartment, told Brittany, "I love you, mama," and collapsed at that apartment's doorway.

Diane Trang, M.D., a medical examiner, performed an autopsy on Valentin. Dr. Trang testified that Valentin had sustained two gunshot wounds. In the first gunshot wound Dr. Trang examined, she observed that the bullet: (1) fractured Valentin's fifth and sixth ribs; (2) hit his diaphragm, stomach, and right lung; (3) "skated across the surface of [his] liver;" and (4) exited through his back. In the second gunshot wound Dr. Trang examined, she observed that the bullet

"just injured the underlying fat tissue only."  Dr. Trang concluded that the first gunshot wound was the fatal one.

The jury found Eaton guilty on one count of murder and one count of aggravated assault. It assessed punishment at twenty years imprisonment for the murder count and ten years community supervision for the aggravated assault count.  The trial court signed judgments convicting Eaton on both counts and sentencing him in accordance with the jury's assessments. Eaton timely appealed.

## II. JURY INSTRUCTION ON DEFENSE OF THIRD PERSON

The abstract portion of the jury charge included instructions on the law of self-defense, deadly force in defense of person, and defense of third person.  *See* TEX. PENAL CODE ANN. §§ 9.31(a), 9.32(a)(2)(A), 9.33.  First, tracking section 9.31(a), the abstract portion provided that "[a] person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force." *See id*. § 9.31(a) (self-defense).  Next, tracking section 9.32(a)(2)(A), the abstract portion provided:

> A person is justified in using deadly force against another:
>
> (1)   If the person would be justified in using force against the other in the first place, as set out above; and
>
> (2)   When and to the degree the person reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force.

*See id*. § 9.32(a)(2)(A) (deadly force in defense of person).  Thirdly, tracking section 9.33, the abstract portion provided:

> A person is justified in using force or deadly force against another to protect a third person if,

    (1)       under the circumstances as he reasonably believes them to be, the actor would be justified under the law of self-defense, as instructed above, in using force or deadly force to protect himself against the unlawful force or deadly force he reasonably believes to be threatening the third person he seeks to protect; and

    (2)       the actor reasonably believes that his intervention is immediately necessary to protect the third person.

*See id*. § 9.33 (defense of third person).

In Eaton's first issue, he argues that the trial court erred in overruling his objection to the inclusion of the paragraph on defense of third person. He specifically argues that "[b]ecause the instruction is a defensive instruction it was wholly erroneous to include it in the jury instruction." Eaton also argues that the paragraph on defense of third person is a comment on the weight of the evidence.

In response, the State raised a textual argument. After briefing and before oral argument, the State advised us that *Bennett v. State*, 726 S.W.2d 32, 34 (Tex. Crim. App. 1986), supported its textual argument. In *Bennett*, Donald Bennett pulled a gun on Mark Rattan, his daughter's boyfriend, while the two were in Bennett's parked pickup. *Id*. Bennett testified that he did so because he "wanted to scare that boy so bad that every time he even thought about [Bennett's daughter], he wouldn't." *Id*. Soon thereafter, Rattan's father and his houseguest, Tom DeRushia, went to Bennett's pickup armed because they were aware of an altercation between the two the previous day. *Id*. The court of criminal appeals described the ensuing events:

> DeRushia opened the driver's door and commanded [Bennett] to "get the gun out of the kid's face." Without turning to look at DeRushia, [Bennett] responded: "This is none of your business. This is between me and Mark." At this, DeRushia repeated his command, then reached in and grabbed [Bennett's] shoulder, turning him around. [Bennett] testified that, seeing DeRushia's gun in the dome light, he thought, "It's all over. That guy is fixing to kill me." [Bennett] shot DeRushia in the head, killing him.

*Id*. The trial court, over Bennett's objection, included a defense of third person paragraph in the jury charge. The court of appeals reversed. It reasoned that "because the accused is the only 'person whose criminal responsibility is in issue in a criminal action,' he is the only possible 'actor' in the cause." *Id*. at 36 (citations omitted). The court of appeals explained that section 9.33 of the Texas Penal Code:

> only applies where the evidence raises the issue of whether the *accused* used force or deadly force in defense of a third person. To have charged the jury in this cause on the law of defense of a third person as it applies to DeRushia's conduct was therefore not authorized under the statute.

*Id*. The court of criminal appeals disagreed. *Id*. It held that:

> Where the evidence raises some question whether the deceased's conduct was justified, as it did in this cause, the deceased becomes "a person whose criminal responsibility is in issue" in the case . . . . That it would have been error for the trial court to have given an instruction on the law of defense of a third person as it pertained to appellant, since that issue was not raised by the evidence, does not mean the court lacked authority to instruct the jury on the deceased's right to defend a third person, should a full assessment of appellant's claim of self-defense, as developed by the evidence, warrant it.

*Id*. at 36–37.

The State's textual argument tracks the analysis employed in *Bennett*. By the same token, the argument that Eaton raises on appeal is the argument that the court of criminal appeals rejected in *Bennett*. Finally, Eaton's contention that the paragraph on defense of third person is a comment on the weight of the evidence fails. Under *Bennett*, the trial court did not error in including defense of third person in the jury charge, and the paragraph tracks the statute. "A jury charge which tracks the language of a particular statute is a proper charge on the statutory issue." *Riddle v. State*, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994).

We overrule Eaton's first issue.[1]

### III. Valentin's Character

Although Brittany had testified during the State's case-in-chief, Eaton called Brittany back as a defense witness. Before the jury, Brittany acknowledged that she had told a defense investigator that Valentin was a fighter and that he never backed down. In an offer of proof outside the jury's presence, Brittany testified that Valentin had been stabbed and shot before his encounter with Eaton. She also elaborated that Valentin was a fighter since middle school and that he would not back down from a person with a gun or a knife. The State objected to this testimony as not constituting a habit. *See* TEX. R. EVID. 406 ("Evidence of a person's habit . . . may be admitted to prove that on a particular occasion the person . . . acted in accordance with the habit . . . ."). Eaton, through counsel, argued that:

> Now, I think Brittany testified about his habit, about the circumstances surrounding the killing, the fact that he doesn't back down from fights, that he didn't back down in that video. Even when Jordan was done with him, he walked past him. It's relevant. It's necessary to present a defense, his right to present a defense that is effective.
>
> His right to effective assistance on cross of her — or direct of her at this stage would be affected, due process and due course of law, you know, the right to confront her. All of these rights are affected by the deprivation of such relevant and material evidence to, you know, what little has been put on of the other party to this, you know, the decedent.

---

[1] At oral argument, Eaton referenced *Morgan v. State*, 545 S.W.2d 811, 815 (Tex. Crim. App. 1977), for the unbriefed contention that the evidence did not support instructing the jury on defense of third person because Detective Walter Henning acknowledged that he interpreted the shooting video as showing Eaton "walking kind of away from Valentin." In relation to the jury instructions, Eaton's brief never argues that the evidence was insufficient to support instructing the jury on defense of third person. We respectfully decline to consider this unbriefed issue. *See Moore v. State*, 165 S.W.3d 118, 122 (Tex. App.—Fort Worth 2005, no pet.) (citing TEX. R. APP. P. 39.2) ("An appellant may not raise new points during oral argument; therefore, we will not address these previously unmentioned offenses because they were not included in the written argument of Appellant's brief."); *see also* TEX. R. APP. P. 39.2 ("Oral argument should emphasize and clarify the written arguments in the briefs.").

Eaton also argued that Brittany's testimony was evidence that Valentin had a character trait for violence. The trial court sustained the State's objection, and it excluded the offer of proof testimony.

In Eaton's second issue, he argues that the trial court's sustaining of the State's objection constitutes: (1) a violation of his federal and state constitutional rights to present a defense; (2) a violation of his right to confront witnesses under the federal and state constitutions; and (3) an abuse of discretion. The State argues Eaton failed to preserve the complaints that he now presents. It also argues that the trial court did not abuse its direction.

In Eaton's first argument, he references *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001), for its proposition that "[a] defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule." (citation omitted). He also references the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, section 10 to the Texas Constitution. *See* U.S. CONST. amends IV, VI, and XIV; TEX. CONST. art. I, § 10. In relation to Eaton's second argument, he references *Dixon v. United States*, 333 F.2d 348, 353–54 (5th Cir. 1964), for its proposition that "[t]he right of a defendant in a federal court to confront the witnesses against him, guaranteed by the Sixth Amendment, includes the right to test the truth of those witnesses' testimony by cross-examination." *Id*. (quotation marks and citation omitted).

Eaton's first two arguments fail to explain how the general propositions in the legal authority he references support his contention that the trial court's exclusion of Brittany's offer of proof testimony constitute a violation of his constitutional rights. None of these cases address the exclusion of a decedent's allegedly bad character or habit. In *Tong v. State*, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000), the court of criminal appeals cautioned:

> This is not to say that appellant may not make a novel argument for which there is no authority directly on point. However, in making such an argument, appellant must ground his contention in analogous case law or provide the Court with the relevant jurisprudential framework for evaluating his claim. In failing to provide any relevant authority suggesting how the judge's actions violated any of appellant's constitutional rights, we find the issue to be inadequately briefed.

*Id.* (citations omitted).

Assuming without deciding that Eaton adequately briefed his first two arguments, we cannot say that the authority he references supports a conclusion that the exclusion of Brittany's offer of proof testimony constitutes a violation of Eaton's rights under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, section 10 to the Texas Constitution. *See* U.S. CONST. amends IV, VI, and XIV; TEX. CONST. art. I, § 10.

In Eaton's third argument, he argues that the trial court abused its discretion under Texas Rule of Evidence 404(a)(2) in excluding Brittany's offer of proof testimony, which he characterizes as evidence of Valentin's "violent character." *See* TEX. R. EVID. 404(a)(2)(A) ("In a criminal case, a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it.").

Eaton references *Torres v. State*, 71 S.W.3d 758 (Tex. Crim. App. 2002), as support for his argument. In *Torres*, an ex-boyfriend climbed up to his ex-girlfriend's second story balcony to gain access to her apartment. *Id.* at 760. Once inside, the ex-boyfriend confronted the ex-girlfriend's aunt, whom the former couple had lived with, wanting to find the ex-girlfriend. *Id.* Although the ex-boyfriend did not use the word "kill," aunt testified that she was afraid the ex-boyfriend's words were a threat against her life. *Id.* A few days later, the ex-girlfriend invited Juan Torres to spend the night. *Id.* at 759. The next morning, the ex-girlfriend heard a noise outside and saw the ex-boyfriend. *Id.* She went to a different room in the apartment and dialed 911. *Id.* She then heard a thump and two gunshots. *Id.* The ex-boyfriend was found dead sitting

on the commode in the bathroom with a fatal gunshot wound to the face. *Id*. The trial court excluded the aunt's testimony. The court of criminal appeals noted that "[w]hen a defendant claims that the deceased was the first aggressor, prior specific acts of violence relevant to the ultimate confrontation may be offered to show a deceased's state of mind, intent, or motive." *Id*. at 761 (footnote and citations omitted). It held that the aunt's testimony:

> . . . shows a mind set of violence against those who might stand between [the ex-boyfriend] and [the ex-girlfriend]. It could also explain [the ex-boyfriend's] unorthodox entry by demonstrating the intent or motive of getting back with [the ex-girlfriend] one way or another, or keeping others away from [the ex-girlfriend] by violence if necessary. Because the proffered testimony was probative of the deceased's state of mind, intent, and motive, we hold that the Court of Appeals erred in concluding that the evidence was relevant only to character conformity.

*Id*. at 762.

Eaton's reliance on *Torres* is misplaced. As the trial court was considering Eaton's argument, it noted:

> So what are you trying to get in that he was the first aggressor? Surely not that he's been shot at because you didn't establish that in that situation. He could have been waiting for a bus[,] and he got shot at. That has nothing to do with first aggressor. The stabbing — he could have been just waiting for a bus and got stabbed. It doesn't show anything about first aggressor.

The fact that Brittany acknowledged Valentin had been shot and stabbed at some unspecified time during some unspecified altercation, had been a fighter since middle school, and did not back down from a person with a gun or a knife, does not constitute specific acts of violence relevant to the ultimate confrontation that may show Valentin's state of mind, intent, or motive. *Id*. at 761. Accordingly, the trial court did not abuse its discretion in sustaining the State's objection.

We overrule Eaton's second issue.

### III. CUSTODY VIDEO

Before the State began its cross examination of Eaton during the guilt-innocence phase, it moved to admit a six-second video (the "custody video") of Eaton being led to a police vehicle by two police officers. The upper left corner of the custody video shows the "KSAT TV San Antonio" logo. It depicts Eaton in a white jumpsuit and his hands handcuffed behind him as he walks to a police vehicle. A news reporter is heard asking Eaton, "why'd you shoot him?" Eaton answers, "self-defense." The State argued that, during his direct examination, Eaton had painted a mental state of him being sad and contrite by recalling that he cried after his girlfriend texted him that Valentin had died. The State argued that the custody video rebutted this mental state and instead showed Eaton acting smug or arrogant. The State also argued:

> . . . [W]e don't believe that the defendant has really admitted to the conduct. He said that the first shot was an involuntary reaction, his body reacted. And then he said the second shot — and I wrote it down. He said the second shot, he doesn't know if he fired it.
>
> They're trying to have their cake and eat it, too. They're going to try to argue manslaughter, that he didn't have the culpable mental state for murder and then they're going to try to argue self-defense, too. And this video goes directly showing that he boldly claims self-defense. He's boldly admitting to the conduct. And they opened the door to what his emotional mental state after the shooting was when they had him answer that question.

Eaton objected on the grounds that the custody video was unfairly prejudicial. The trial court overruled Eaton's objection.

In Eaton's second issue, he argues that the video is unfairly prejudicial. Eaton references *Mouton v. State*, 457, 235 S.W.2d 645, 650 (1950), for the proposition that admitting photographs of the accused in handcuffs during trial is error. He also references *Lucas v. State*, 791 S.W.2d 35, 55 (Tex. Crim. App. 1989), for its holding that it would be error to admit a video of the defendant in handcuffs or restraints without the record reflecting "good and sufficient reason for such

extraordinary measures[.]" Eaton argues that the State's reasons do not constitute a good and sufficient reason because the jury would be instructed on the law of self-defense and the State could have admitted his assertion of self-defense through only the audio portion of the video or a witness's recollection of his statement.

At oral argument, the State conceded that the custody video violates *Lucas*. Nevertheless, the State maintained that the err was harmless. In *Lucas*, the court of criminal appeals applied the constitutional error standard. *See id*. at 56 (citing former TEX. R. APP. P. 81(b)(2)) ("[W]here error is found in the trial proceedings below, the conviction or sentence must be reversed unless it is determined beyond a reasonable doubt the error made no contribution to the conviction or punishment."); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (en banc) ("For constitutional errors, the old Rule 81(b)(2) standard remains, now present in TEX. R. APP. P. 44.2(a)."). The court of criminal appeals in *Lucas* held that:

> [W]e can find no harm in the jury's view of a handcuffed accused where the contact occurs simultaneously with the accused's voluntary, detailed descriptive confession of guilt at the scene of the crime. We stress the fact that appellant, over the most strenuous of warnings by counsel present on the scene, unequivocally made known his intention to disregard those warnings and to further implicate himself in the matter through the medium of videotape. The impression given the jury, if any, was of a minimally restrained individual who was then freely confessing to a murderous act while moving about on the shoulder of a busy interstate highway.

*Lucas*, 791 S.W.2d at 56.

The video in this case cannot be categorized as a confession akin to the one in *Lucas*. Rather, Eaton's assertion of "self-defense," if believed by the jury, would have directed the jury to render a not guilty verdict for Valentin's death. *See Alonzo v. State*, 353 S.W.3d 778, 781 (Tex. Crim. App. 2011) ("If a fact-finder believes that a defendant's actions are justified under Chapter 9 (or has a reasonable doubt that the actions were justified under Chapter 9), the plain meaning of Sections 9.02 and 2.03 is that the fact-finder may not convict the defendant for an offense based

on those actions."). Also unlike in *Lucas,* 791 S.W.2d at 56, there is no indication that Eaton made the statement after a "strenuous" consultation with his attorney. While the jury was deliberating, it requested the video evidence, and the trial court provided the jury with it. At the start of the State's closing argument, it led off with:

> "Man shoots an unarmed woman petting dog, then kills unarmed husband." That's the headline so far. And now that you have received all of the evidence, your verdict will provide the rest of that headline for our community.
>
> With the evidence that you've received beyond a reasonable doubt, the headline should be finished, "Defendant found guilty of aggravated assault with a deadly weapon and murder. Jury to assess punishment." Because that's what your verdict should be based on the evidence and as the headline that reflects what the evidence demonstrates and what the values of our community should be.

As the State continued its closing argument, it referenced the custody video again, arguing that Eaton left the scene without rendering aid and "then seven or eight hours later stare[s] into a camera with a smirk on [his] face and say[s], self-defense." Thus, the State weaved the custody video that it now concedes violated *Lucas* twice through its closing argument. The shooting video does not assuage any concern that the custody video made no contribution to the conviction. Valentin is heard telling Eaton, "I'll beat your ass. I don't need money to beat your ass. I promise you that." In an altercation where both men expressed aggression, the custody video may have tilted the jury to placing more fault on Eaton, particularly when it weighed the count of murder and the lesser included offenses of manslaughter and criminally negligent homicide.

For these reasons, we cannot determine beyond a reasonable doubt that the error did not contribute to the conviction. *See id.*; *see also* TEX. R. APP. P. 44.2(a). We sustain Eaton's second issue.

## V. SHERROD'S STATEMENT

As part of the investigation, San Antonio Police Detective Walter Henning interviewed Sherrod. On examination by the State and over Eaton's objections on improper character evidence and Confrontation Clause grounds, the State asked, and Detective Henning answered:

> Q. . . . And I'm going to ask you: During the course of your investigation, did you learn that two days prior to the defendant committing this murder that the defendant pulled a gun on a man named Derek [Sherrod] because Derek's dog charged at the defendant?
>
> A. I was told that, yes.

Later on cross examination of Eaton, the State asked:

> Q. But whenever you have problems, Mr. Eaton, you pull out a gun; isn't that correct?
>
> A. No, that's not correct.
>
> Q. Well, Mr. Eaton, you pulled a gun on Derek two days before for an issue with dogs, correct?
>
> A. No, that's not correct.
>
> Q. I want to talk about Derek a little bit here. You're essentially saying that Derek is saying something that isn't true, right?
>
> A. Yes.

In Eaton's fourth issue, he argues that Detective Henning's answer constitutes a Confrontation Clause violation and an abuse of discretion under Texas Rule of Evidence 404(b). *See* TEX. R. EVID. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Although the State's appellate brief asserts that "[t]here was no violation and any error was harmless beyond a reasonable doubt," it makes no argument, supported by

authority, for its assertion that the trial court did not err in overruling Eaton's objections. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). The State also presents no argument for how Sherrod was unavailable.

"Consistent with the Confrontation Clause guarantee, a testimonial hearsay statement may be admitted in evidence against a defendant 'only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.'" *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008) (quoting *Crawford v. Washington*, 541 U.S. 36, 59 (2004)). There is no indication Sherrod's statement, recounted by Detective Henning, was admitted for anything other than to prove the truth of the matter asserted. *See* TEX. R. EVID. 801(d) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."). Accordingly, the trial court abused its discretion in overruling Eaton's objections.

Next, both parties agree that the non-exclusive factors in *Davis v. State*, 203 S.W.3d 845, 850 (Tex. Crim. App. 2006), determine if the error was harmful. Those factors being:

(1)     The importance of the witness's testimony in the prosecution's case;
(2)     Whether the testimony was cumulative;
(3)     The presence or absence of evidence corroborating or contradicting the witness's testimony on material points;
(4)     The extent of cross-examination otherwise permitted; and
(5)     The overall strength of the prosecution's case.

*Id.*

The State emphasizes that Detective Henning's testimony was short, consisting of one answer. The State highlights that the shooting video shows Sherrod talking to Eaton and taking his handgun, and this interaction shows that Sherrod was not afraid of Eaton, even in light of the alleged encounter two days earlier. Sherrod's statement involved merely pulling a gun, whereas

the counts against Eaton involved discharging his gun. This distinction, according to the State, makes Sherrod's statement "not particularly damning" under the *Davis* factors. The overall strength of the State's case was strong, as it contends, because the shooting video coupled with Brittany's testimony left no room to justify Eaton's conduct.

Eaton argues that Sherrod's statement was important to the State's case in rebuttal because it was evidence of extraneous conduct that painted Eaton as the first aggressor. He argues that the shooting video does not clearly depict his hand on the trigger when the fatal shot is discharged. Eaton references his own testimony wherein he recounted:

Q. So both of you have your hands on the gun?

A. Yes, sir.

Q. When we go back, whose hands are on the gun at that point?

A. Valentin Gonzales.

Q. Are your hands on that gun as well?

A. Yes, one of my hands is on the gun as well.

Q. So when the last shot goes off, both of your hands are on the gun?

A. I'm not sure.

Q. On the gun, not the trigger.

A. Yes, I believe so.

Q. And so are the two of you still fighting over the gun at this point?

A. Yes, sir.

Q. At this point when Valentin is on top of you, what's going on in your mind?

A. I'm fighting for my life. I still didn't know what was really going on. I just know that somebody was on top of me trying to take the gun.

Q. Do you know how much you weighed at the time?

A.   Around 120 to 130 pounds.

Q.   At this point can you see whose hands are on the gun still?

A.   Yes.

Q.   Whose hands are still on that gun?

A.   Valentin Gonzales.

Q.   Did you believe that he would take the gun?

A.   Yes, sir.

Eaton further challenges the State's contention that the shooting video was conclusive by arguing that the State's case "was weakened significantly when the defense elicited testimony from Detective Henning that it looked like [Eaton] had pointed the gun down and began to turn away when Valentin hit him in the head." According to Eaton, Sherrod's statement nudged the jury into believing that Eaton was the first aggressor, especially in a case where self-defense played a central part of the testimony and closing arguments.

As for the first *Davis* factor, although Detective Henning's testimony was short, it conveyed three facts: (1) Eaton pulling a gun; (2) in the two days before the shooting; and (3) during an incident involving a dog. These three facts tether Sherrod's statement to the instant shooting. The State concedes the second *Davis* factor — that Detective Henning's testimony was not cumulative of other evidence. Third, neither party directs us to any evidence corroborating or contradicting Detective Henning's testimony. Under the fourth *Davis* factor, as Eaton emphasizes, the State cross examined him with Detective Henning's one answer. This undercuts the State's assertion that Sherrod's statement was "not important."

Under the fifth *Davis* factor, the State emphasizes that its case was strong, and Sherrod's statement was "not important" to making the case, as evidenced by it not being mentioned in

closing argument. However, the imagery of Sherrod's statement is echoed in the shooting video's depiction of Eaton pulling a gun near his puppy. Sherrod's statement lent weight to the State's closing theme that Eaton was the aggressor who escalated the verbal confrontation. For example, during closing the State argued:

> Well, he tried [to shoot Britanny]. He just missed. That's all there is to it. He just missed. He said he was going to go do it, he did it, he just missed. And let's just mention that for a second. There but for the grace of God. If he kills her and then he kills Valentin Gonzales, it's a whole separate issue here. We're talking about capital murder for killing two different people in the same episode. We're potentially talking about the death penalty here.

This theme bolstered the State's contention that Valentin was justified in defending Brittany — a jury instruction that the State championed. Therefore, we cannot say that Sherrod's statement did not affect how the jury assessed the seconds after the "warning shot," as Eaton terms it, where he contends, he was walking away. If the jury deemed Eaton as a persistent first aggressor — as Sherrod's statement may tend to support — then it may have increased the likelihood that Valentin's decision to strike the back of Eaton's head in defense of Brittany was reasonable. Thus, the fifth *Davis* factor points to harm.

We sustain Eaton's fourth issue.

### VI. CONCLUSION

Having addressed all of Eaton's issues, we reverse the trial court's judgments of conviction and sentence and remand this case for a new trial.

Rebeca C. Martinez, Chief Justice

DO NOT PUBLISH